Ronald M. BEHAGEN; and Marvin D. Taylor, a minor, by Juanita Taylor, his mother and natural guardian, Plaintiffs,

v.

INTERCOLLEGIATE CONFERENCE OF FACULTY REPRESENTATIVES, an association, Defendant.

No. 4–72–Civ. 103.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 22, 1972.

Frank J. Brixius and Reed K. Mackenzie, Hvass, Weisman & King, Minneapolis, Minn., for plaintiff Behagen.

Ronald L. Simon, Simon, Schneider & Marker, Minneapolis, Minn., for plaintiff Taylor.

Byron L. Gregory, McDermott, Will & Emory, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

LARSON, District Judge.

Plaintiffs are students at the University of Minnesota and until January 28, 1972, were members of its varsity basketball team. On that date they were suspended from further intercollegiate competition for the remainder of the current basketball season. The suspensions resulted from their participation in an altercation which occurred during a basketball game with Ohio State University. Both schools are members of the defendant Intercollegiate Conference of Faculty Representatives, more commonly known as the Big Ten.

Plaintiffs are seeking a preliminary injunction. They allege that they were suspended without proper notice and opportunity to be heard and as a result thereof were denied their rights to due process as are secured by the Fourteenth Amendment to the Constitution of the United States. They have asked this Court to enjoin defendant from enforcing such suspensions until they have been granted their rights to due process.

Four factors must be considered in determining the propriety of a request for a preliminary injunction. Northwest Airlines, Inc. v. The Air Line Pilots Association, International, 325 F. Supp. 994 (D.Minn.1970). Those factors are:

1. Has the plaintiff shown substantial probability of success at trial on the merits?

2. Has the plaintiff shown irreparable injury?

3. Will the interests of the other party be substantially impaired by issuance of such an Order?

4. How will the public interest be affected?

There has been much publicity surrounding the incident which precipitated this suit, as well as the suit itself. Even before a decision had been reached this was denominated a "landmark case." Such a characterization, as was much of the publicity, seems unjustified. Just as brawls in college athletics are becoming distressingly common, the legal questions presented here are far from new. In fact the parties are not in dispute as to the law. The defendant does not contest the fact that any actions taken by it constitute State action, as is required for this Court to assume jurisdiction under the provisions of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). Likewise, the Big Ten has not disputed that the plaintiffs' interest—an opportunity to participate in intercollegiate athletic competition at one of its member institutions—is substantial. Indeed, it would be hard to so dispute in light of analogous cases which indicate the direction in which this area of the law is evolving. Kelley v. Metropolitan County Board of Education of Nashville, 293 F.Supp. 485 (M.D.Tenn.1968); Curtis v. National Collegiate Athletic Association, (N.D. Cal. No. C–71–2088 ACW, February 1, 1972).

While "big time" college athletics may not be a "total part of the educational process," as are athletics in high school, *Kelley, supra,* nonetheless the opportunity to participate in intercollegiate athletics is of substantial economic value to many students. In these days when juniors in college are able to suspend their formal educational training in exchange for multi-million dollar contracts to turn professional, this Court takes judicial notice of the fact that, to many, the chance to display their athletic prowess in college stadiums and arenas throughout the country is worth more in economic terms than the chance to get a college education.

It is well recognized that the opportunity to receive an education is an interest of such substantial importance that it cannot be impaired without minimum standards of due process. Jones v. Snead, 431 F.2d 1115 (8th Cir. 1970); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969); Soglin v. Kaufman, 418 F.2d 163 (7th Cir. 1970); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961). One basis for those decisions is the fact that education is such a necessary ingredient of economic success in later life that it should not be arbitrarily interrupted or terminated. It has also been held that high school students' interests in participation in athletics are so substantial that they cannot be impaired without proceedings which comply with minimum standards of due process. *Kelley, supra.* Surely, the interests of college athletes in participating in activities which have the potential to bring them great economic rewards are no less substantial.

Since the questions of law are not in dispute, it is the Court's primary task to be a fact finder. Only after analysis of the facts can a determination of whether fundamental due process has been accorded the plaintiffs by the defendant be made.

It is essential to note at the inception that the Big Ten is a relatively unstructured organization, a fact which has caused no small part of this controversy, and which should be remedied without delay. The Conference has no formal constitution. It is governed by precedent and by formal resolutions. Handbook of the Intercollegiate Conference, p. 4. Such resolutions apparently may be passed by either the Faculty Representatives or by the Athletic Directors.[1] The Faculty Representatives are

---

1. These two bodies are responsible for conducting the affairs of the Conference.

Each member is entitled to appoint one member of its faculty to be its Faculty

the primary legislative body in the Conference, with control over membership and eligibility. They have, however, delegated some authority to the Athletic Directors. Largely, such authority lies in the area of athletic administration, and rules of play. Handbook, p. 5.

In addition, the Conference employs a Commissioner, who is the chief administrative officer. His duties include, among other things, enforcement of the rules, regulations, and agreements of the Conference and promotion of its general welfare. Handbook, p. 11. The procedures for enforcement of the rules, regulations, and agreements are delineated in Section VI of the Handbook, pp. 13–17. It is within the context of these enforcement procedures which the events occurring after the altercation on January 25 must be viewed.

### FINDINGS OF FACT

From the motion papers and affidavits and evidence presented at the hearing on February 18, 1972, for a preliminary injunction, the Court makes the following findings:

1. Pursuant to his authority under § VI(A) para. 4 of the Handbook, the Commissioner on January 26, 1972, instituted an investigation of the altercation occurring during the Minnesota-Ohio State basketball game.

2. During the course of his investigation he interviewed participants, coaches, athletic directors, and school officials of both schools. He viewed films of the game. He consulted with the game officials and with the supervisor of officials for the Conference, who along with the Commissioner had seen the game in person.

3. On Friday morning, January 28, he consulted with the Committee on Intercollegiate Athletics of the Twin Cities Campus Assembly [2] which had been conducting its own investigation of the incident. Section VI(A) para. 4 of the Handbook provides for consultation between the Commissioner and member schools in order to arrive at the appropriate remedial action. However, it appears that primary responsibility for remedial action falls on the member schools themselves. After these discussions, it was agreed that the Committee would suspend the plaintiffs from further intercollegiate athletic competition for the remainder of the season, pending further investigation.

4. The plaintiffs were formally suspended by the Committee on Friday, January 28, 1972.

5. On January 31, 1972, it became apparent that the Commissioner and the Committee were not in agreement on all particulars of the suspension. The Committee did not intend that the suspension bar participation in practice, but rather limited it only to games. Since the Commissioner did not consider this portion of the Committee's action to be "satisfactory remedial action," he was required, pursuant to § VI(C), to make a report to the Directors of Athletics.

6. He made such a report at the Athletic Directors' meeting on January 31, 1972, and they determined that the suspension should also bar participation in practice.

7. On February 1, 1972, the University of Minnesota, through its Faculty Representative, appealed the Athletic Directors' decision to the Faculty Representatives as a whole, as provided by § VI(C) para. 4. On the same day the

Representative. Additionally, the Athletic Director from each school is automatically a member of the group called in the Handbook the "Directors of Athletics."

2. The Twin Cities Assembly is the elected governing body of the Twin Cities Campus of the University of Minnesota. It exercises general legislative authority and responsibility over educational matters concerning the Twin Cities Campus which are delegated to it by the University Senate and the Board of Regents. It has several standing committees, one of which is the Committee on Intercollegiate Athletics. Its primary purpose is to exercise faculty control over intercollegiate Athletics.

Faculty Representatives affirmed the decision of the Athletic Directors.

8. On February 4, 1972, the Twin Cities Assembly Committee on Intercollegiate Athletics reopened its investigation of the incident. It held hearings for five days and on Thursday, February 10, 1972, determined that because of "significant omissions regarding 'due process'" plaintiffs' rights had been violated, and for this and other reasons the suspensions were lifted.

9. On February 11, 1972, the Commissioner, acting pursuant to his power to promote the general welfare of the Conference § III(5), Handbook, suspended the plaintiffs.

10. Immediately thereafter, pursuant to § VI(A) para. 4, Handbook, the Commissioner undertook to re-examine the findings made in his initial investigation. He reviewed game films, talked with officials, attempted to talk to plaintiffs, and attempted to secure a copy of the transcript of the Committee hearings.

11. Upon completion of his review, still being of the opinion that the evidence warranted suspension for the season, the Commissioner, pursuant to § VI(C) para. 1, took action to convene a hearing by the Athletic Directors.

## CONCLUSIONS

From the above facts this Court has arrived at the following conclusions:

■ 1. The initial suspensions of plaintiffs were made by the Twin Cities Campus Assembly Committee on Intercollegiate Athletics, and therefore the Big Ten was not responsible for any deprivation of rights which the plaintiffs may have suffered thereby.

■ 2. The decision of the Big Ten that the suspensions should include a prohibition against practicing as well as against participation in games was reached without according the plaintiffs their constitutional rights to due process of law.

This decision by the Big Ten was made with total disregard for its own procedures as set out in § VI(C) para. 1. Therein it specifically states that:

"The Directors shall afford the institution, its employees or students, concerned an opportunity to appear at the meeting in which the Commissioner's report is made and to be heard in defense against charges."

This was never done. Any report which was made to the Directors of Athletics at their January 31, 1972, meeting is as yet undisclosed, and it is undisputed that none of the participants were ever appraised of the meetings, let alone offered an opportunity to speak in their own defense.

■ It is elemental that action beyond the scope of a body's own procedural regulations is a violation of due process of law. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

Thus, ruling that plaintiffs were barred from participation in practice without granting them a hearing was improper.

■ 3. The Commissioner is given the power to promote the general welfare of the Conference. It is consistent with this grant of power that he have the authority to temporarily suspend players, pending a hearing by the Directors of Athletics, if in his view a suspension is necessary to protect the interests of the Conference. Such power is not necessarily the power to punish.

■ A preventive suspension issued under this power does not violate due process unless it is imposed arbitrarily and capriciously, and is in fact punitive. This Court is of the opinion that the Commissioner's suspension, imposed on

February 11, 1972, had a reasonable basis in fact, and that it was not imposed for purposes of punishment, but rather to preserve the status quo until a hearing before the Directors of Athletics could be arranged. It was reasonable for him to conclude that if the suspended players were permitted to participate in intercollegiate competition prior to a final determination of their case that other incidents might occur, regardless of model behavior on their parts or their best efforts to prevent them. The highly emotional aspects of the original altercation had been so fanned by needless post game comments of supposedly mature individuals and spectacular press coverage that the atmosphere surrounding the Minnesota basketball team was highly charged.

■ 4. The Court is of the opinion that if these suspensions are continued longer than is reasonably necessary for the Commissioner to prepare his report and to secure a hearing by the Directors of Athletics, they will become punitive and will at such time deprive plaintiffs of their rights to due process. Stricklin v. Regents of the University of Wisconsin, 297 F.Supp. 416 (W.D.Wis.1969).

## RELIEF

In fashioning a remedy it is useful to note the similar case of Kelley v. Metropolitan County Board of Education of Nashville, *supra*. There, following a fight stemming from a closely contested basketball game, the Nashville School Board suspended one school from participation in athletics. Being in agreement with the School Board's disposition of the case, and having no reason to believe the suspension would later be lifted, the Tennessee Secondary School Athletic Association imposed a like suspension, without a hearing. There the local board's suspension was lifted when the Court determined that due process had not been accorded the suspended school. Although the Court invalidated the School Board's suspension, it specifically held that the Athletic Association had not infringed upon the constitutional rights of the suspended school by not also conducting a hearing, since there was no need to do so in light of the School Board's suspension. However, it did require the Athletic Association to conduct a hearing in order to continue to impose its suspension. Here until February 11, 1972, there was no need for the Big Ten to conduct a hearing concerning the suspension from games, since it could have assumed the Committee's suspension would remain in force.

The plaintiffs having shown irreparable injury and the likelihood of success at trial on the issue of their suspension from practice, but having failed to show likelihood of success at trial on the issue of participation in games, unless the Athletic Directors do not hold a hearing, as is required by their rules, within a reasonable time, it is the opinion of this Court that relief should be granted in the following manner:

1. The Intercollegiate Conference of Faculty Representatives is hereby enjoined from prohibiting Ronald Behagen and Marvin Taylor from participating in practice with the University of Minnesota basketball team, until such time as hearings which meet minimum standards of due process are held.

2. The preventive suspensions imposed by the Commissioner of the Intercollegiate Conference of Faculty Representatives shall be deemed to have been imposed for an unreasonably long time, and therefore to be punitive, if by 6:00 P.M., Friday, February 25, 1972, there has been no determination by the Directors of Athletics of the Intercollegiate Conference of Faculty Representatives that the suspensions shall remain in force. As such, they will constitute violations of the plaintiffs' rights to due process of law, and the Intercollegiate Conference of Faculty Representatives will be enjoined from enforcing them from that point forward.

The elements of a hearing which are necessary to accord due process vary with the situation. In determining what those elements are in any particular case it is of primary importance to look at the interests affected and the manner in which they are affected. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S. Ct. 624, 95 L.Ed. 817 (1951). For guidance of the parties in any further proceedings this Court has examined those factors here and is of the opinion that the following are necessary in order for a hearing to meet the rudimentary requirements of due process. Plaintiffs should be given a written notice of the time and place of the hearing at least two days in advance. Accompanying such notice should be a specification of the charges against each, and the grounds which, if proven, would justify imposition of a penalty. The hearing should be such that the Directors of Athletics have an opportunity to hear both sides of the story. This does not require a full-dress judicial hearing, with the right to cross-examine witnesses. However, it should include the presentation of direct testimony in the form of statements by each of those directly involved relating their versions of the incident. Plaintiffs should be given a list of all witnesses who will appear, and should be allowed to hear all testimony. Plaintiffs should be given a written report specifying the Directors' findings of fact, and if there is to be any punishment the basis for such punishment. The proceedings should be recorded, and the tapes should be made available to plaintiffs in the event they wish to appeal to the Faculty Representatives, as is their right pursuant to § VI(C) para. 4 of the Handbook. If these minimal standards are followed in cases of this nature, it is this Court's opinion that the requirements of due process will have been met. See generally, Dixon v. Alabama State Board of Education, *supra*.

It is so ordered.