**Jefferson David EDWARDS, Jr., Plaintiff,**

**v.**

**The BOARD OF REGENTS OF NORTH-WEST MISSOURI STATE UNI-VERSITY et al., Defendants.**

**No. 74 CV 2-SJ.**

United States District Court, W. D. Missouri, St. Joseph Division.

July 8, 1975.

Ann Whittier, Achtenberg, Sandler, Balkin & Helman, E. L. Pendleton, North, Colbert, Pendleton & Fields, Kansas City, Mo., for plaintiff.

Larry L. Zahnd, Maryville, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

This case presents the claim of a student that he was denied due process in connection with his expulsion from Northwest Missouri State University (NMSU). Plaintiff seeks to permanently enjoin the defendant Board of Regents and other officials of NMSU from enforcing their decision to expel him, and, presumably prays for an injunction reinstating him in the university. On January 21, 1974 Judge Collinson denied plaintiff's motion for a temporary restraining order reinstating him as a student at NMSU. After pretrial procedures were completed, the parties filed cross motions for summary judgment. For the reasons that will follow, we find and conclude that defendants' motion for summary judgment should be granted.

## I. FINDINGS OF FACT

The factual circumstances surrounding plaintiff's expulsion have been stipulated by the parties:

1. Plaintiff is a citizen of the United States and a resident of the State of Missouri; and was a student at Northwest Missouri State University, Maryville, Missouri, from September, 1969 until the order of expulsion of March 6, 1973, referred to herein.

2. Northwest Missouri State University is a state-operated institution of higher education situated at Maryville, Missouri. Defendant The Board of Regents for the Northwest Missouri State University is the duly appointed governing body of said University under the laws of the State of Missouri, and is a quasi-public corporate entity established by Missouri law (Chapter 174, V.A.M.S.). Defendant Charles Thate is the Provost of NMSU and was formerly the Vice President for Student Affairs. Defendant Robert P. Foster is the President of NMSU. The capacities of the remaining defendants with the University are as follows:

| | |
|---|---|
| Arthur Mallory | Missouri Commissioner of Education, and, as such, Ex Officio member of The Board of Regents |
| Richard Buckridge | Director of Admissions |
| Ruth Nystrom | Former Registrar |
| Robert E. Bush | Dean of Admissions and Records |
| Phillip H. Hayes | Dean of Students |
| Everett W. Brown | Assistant to the President |
| Donald D. Petry | Vice President for Business Affairs |
| Dwain E. Small | Former Vice President of Academic Affairs |
| Mark M. Maddox | Former Director of Financial Aid |

3. The Board of Regents of NMSU on March 6, 1973 included the following persons: W. M. C. Dawson, Wm. Phares, A. B. Vogt, John M. Yeaman, C. F. Russell, James B. Stubbs and Arthur Mallory, Ex Officio.

4. The Student Handbook contains provisions shown on the exhibits attached hereto numbered pages 10, 11, 12, 13, 14, 15, 16, 40, and 41.[1]

5. On or about February 9, 1973, the plaintiff was suspended from defendant Northwest Missouri State University pending a formal hearing before the Student-Faculty Discipline Committee on the charge of persistently irresponsible behavior by a student after repeated warnings by University authorities. On the basis of this suspension plaintiff was not eligible to attend classes in which he was formally enrolled. The specific charges were:

1. Disruption of academic class taught by Mrs. Sharon Browning on February 7, 1973.

2. Attendance in class in which you were not registered after you had been informed in writing that you were not to attend the class.

3. Verbal altercation with Mr. Everett Brown on February 7, 1973.

4. Failure to show proper meal ticket and/or failure to pay for meal on December 8, 1972.

5. Failure to appear before the Student-Faculty Discipline Committee on February 8, 1973, as requested in a letter dated January 31, 1973 from Phil H. Hayes, Dean of Students, and

1. The relevant portions of the NMSU Student Handbook are included in the Appendix to this opinion.

reconfirmed in a telephone conversation of that date.

6. Several written reports of disruptive behavior in the J. W. Jones Union during the past two years.

6. By letter of February 9, 1973 from Phil H. Hayes, Dean of Students, plaintiff was advised of his suspension and pending hearing. This letter is identified as Plaintiff's Exhibit 2.

7. A hearing was held on or about February 15, 1973 before the Student-Faculty Discipline Committee on the basis of the charges outlined above and as provided in the Student Handbook. The plaintiff appeared at the hearing with his witnesses but without counsel.

8. By letter of February 21, 1973, from Phil Hayes, Dean of Students, plaintiff was advised that on or about February 15, 1973 with reference to the above charges, the Student-Faculty Discipline Committee voted unanimously:

That all charges be dropped and Jefferson Edwards be found not guilty and that he be eligible to return to classes in good standing at Northwest Missouri State University and that the Committee recommend a thorough investigation of racial discrimination on this campus.

Plaintiff did not appeal this decision.

9. The plaintiff was not given a hearing before the Student-Faculty Committee as to any charges arising from occurrences subsequent to February 15, 1973.

10. The plaintiff was found not guilty of any charges by the Student-Faculty Discipline Committee at its February 15, 1973 hearing or thereafter and that Committee did not recommend expulsion.

11. Plaintiff was not given any written warning by the Student-Faculty committee *subsequent* to the hearing of February 15, 1973, and he was not given any discipline of any nature by that Committee.

12. On or about February 19, 1973 at or near 12:30 p. m., the plaintiff was suspended from all classes by defendant Charles Thate, Vice President for Student Affairs.

13. By letter dated February 20, 1973, from Dr. E. K. DeVore, Chairman of the NMSU Division of Business, to Robert P. Foster, President, a review of the Jefferson Edwards disciplinary proceeding and consideration of new evidence and charges was requested.

14. A three-page letter from Robert P. Foster, President of NMSU, addressed to plaintiff, dated February 27, 1973 was personally delivered to the plaintiff on February 27, 1973, notifying him of a disciplinary hearing before the Board of Regents for the Northwest Missouri State University at 10:00 a. m. on March 6, 1973, which letter set out in nineteen (19) paragraphs the particular charges and allegations against plaintiff which would be considered.

15. The following specific charges were listed in the President's letter to plaintiff, dated February 27, 1973, as matters to be considered by the Board of Regents:

1. Disruption by you of academic class taught by Mrs. Sharon Browning, Business Department teacher, on February 7, 1973, by irrelevant questions, shouting, disrespectful conversation and refusal to obey the teacher's request to leave.

2. Disobedience to the request of Mrs. Sharon Browning, teacher, that you meet with Dr. E. K. DeVore, department head, concerning your conduct on February 7, 1973.

3. Contumacious, disrespectful comments about the ability of Dr. E. K. DeVore and the Business Department faculty on or about February 7, 1973, to Mrs. Sharon Browning, teacher.

4. Your attempt to leave Union Snack Bar Area without paying for a package of gum on *December 20, 1971* accompanied by harassing and abusive language to the Snack Bar Cashier and Union Night Supervisor when asked to pay for it.

5. Your attendance at Business 314, Personnel Management, class on February 19, 1973, in which class you were not enrolled, your refusal to leave the class upon request of the instructor, Mrs. Emelda Williams, and which class you had been informed not to attend by memorandum from the instructor and by a letter from the Dean of Admissions and Records previously.

6. Failure to show a proper meal ticket and Identification card and/or failure to pay for a meal ticket at the cafeteria on December 18, 1972, and vulgar, insubordinate, threatening language to the cafeteria employees in charge on such occasion.

7. Insubordinate, contumacious, argumentative, disrespectful, abusive and derogatory language toward and remarks to Mrs. Kathryn Belcher, teacher in the Business Department, on October 5, 1972, at her office in Colden Hall.

8. Your failure to appear before the Student-Faculty Discipline Committee on February 8, 1973, as requested by letter from the Dean of Students dated January 31, 1973.

9. False statements made by you to the Student-Faculty Discipline Committee on February 16, 1973, as to the contents of your telephone conversation with the Dean of Students on or about January 31, 1973.

10. Your writing of a disrepectful, irresponsible vulgar letter to Admissions Committee c/o Dr. C. H. Thate, dated January 2, 1973.

11. Your disrespectful, offensive, contumacious language and conduct toward Mr. Bruce Wake, Director of Housing and Administrative Affairs, in his campus office.

12. Threatening, insubordinate, disrespectful and contumacious language used toward Ron Coulter, Men's Residence Director, in cafeteria on or about September 1971 including statement by you to Mr. Coulter that "I'm going to get you."

13. Your disrespectful, contumacious language used toward Dr. Edward Browning, Professor of Business and teacher of Managerial Accounting, on or about December 19, 1972, in Colden Hall on the campus, in which, among other things you called him, "a stubby mother-fucker, a racist, an arrogant bastard, an arrogant wise-ass," and stated that he was incompetent.

14. Your critical, taunting, disruptive, disrespectful, loud, abusive remarks made to Dr. Edward Browning Professor of Business and teacher of Managerial Accounting, during the week prior to finals in December, 1972, including harassing pounding on his office door.

15. Abusive language used toward Dr. Edward Browning, Professor of Business, and teacher of Managerial Accounting, and insubordination by refusing to leave Dr. Browning's office in Colden Hall when requested by Dr. Browning, which events occurred in the week prior to finals in December, 1972.

16. Calling Dr. Edward Browning, Professor of Business, a "racist"

826

at the end of summer school, 1972, and suggesting threats to him, to the extent he asked for police protection.

17. Disrespectful, disruptive conversation with Mrs. Sharon Browning, teacher of class on the Principles of Marketing, in her office in Colden Hall during the third week in October, 1972, during which you called her vulgar names, including saying she was a "Motherfucker, a high-and-mighty ass, an unprepared teacher who should be kicked out of the University, and during which you made a vulgar sign and told her "up your ass." Also, your refusal to wait to talk to Dr. DeVore, department head, as requested by Dr. DeVore and Mrs. Browning.

18. Persistent disobedience to school rules, insubordination to faculty, administration and staff, and persistent contumacy as set forth in the allegations and as shown in the official records and files of the school concerning you.

19. Persistent irresponsible behavior in the matters above set forth after Conduct Warning was given you by the Student Court on March 2, 1972.

16. A specific purpose of the hearing before the Board of Regents, as stated in the above letter, was:

To determine whether disciplinary action including possible suspension or expulsion from the University should be taken against you for disobedience to the rules of the school, contumacy or insubordination.

17. The letter constituted adequate notice in writing of the specific ground or grounds and the nature of the evidence on which the disciplinary proceeding was to be based.

18. Plaintiff was given an opportunity for hearing before the Board of Regents on March 6, 1973, at which he appeared, participated, cross-examined witnesses and presented his testimony and that of other witnesses and at which he presented his position, explanations, and evidence.

19. Earl E. West, Official Court Reporter, Sixth Judicial Circuit of Missouri, Platte City, Missouri, Verbatim Reporter, reported and recorded the hearing of plaintiff before the Board of Regents of NMSU on March 6, 1973 and a true, correct and complete transcript of which has been prepared by said reporter, certified to by him, and is identified as Exhibits A–1 and A–11.

20. Jefferson D. Edwards, Jr., plaintiff, was not denied representation by an attorney on anyone else and did not request any such representation.

21. The Board of Regents of NMSU found that the charges in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 19 of the letter of February 27, 1973 to plaintiff were supported by the evidence presented at the March 6, 1973 hearing before the Board and unanimously voted to permanently expel plaintiff from the University.

22. Notice of the action of the Board of Regents expelling plaintiff was given to him in person following the hearing and by letter from Dr. Robert P. Foster to plaintiff, dated March 9, 1973, which letter has been identified as Defendants' Exhibit F and Plaintiff's Exhibit 8. The minutes of the Board of Regents meeting of March 6, 1973 are identified as Defendants' Exhibit D.

23. There are no student members on the Board of Regents, nor were any students appointed to the hearing of March 6, 1973.

24. On or about December 12, 1973, plaintiff, by letter, applied for admission to said University for the Spring Semester, 1974, which commenced on or about January 9, 1974.

25. The response from said University was received by plaintiff on or about December 17, 1973, signed by defendant Charles H. Thate, Vice President for Student Affairs, which stated that defendant Thate had reviewed the circumstances surrounding plaintiff's dismissal from said University, and as a result must refer plaintiff to the decision of the Board of Regents for said University, and their letter of March 9, 1973. Defendant Thate stated that on the basis of the defendant Board of Regents plaintiff's readmission at this point was impossible.

26. Plaintiff's application for admission was subsequently returned.

27. A review of its records indicates that since 1964 the Board of Regents has not expelled or permitted the expulsion of any student other than plaintiff for which disciplinary action was not taken or recommended by the Student-Faculty Discipline Committee. Several students have been expelled, but the expulsion was recommended by the Student Faculty Discipline Committee and approved by the President of the University.

## II. CONCLUSIONS OF LAW

It is no longer open to question that any expulsion from a state university or college must comport with the due process clause of the Fourteenth Amendment. *Jones v. Snead,* 431 F.2d 1115 (8th Cir. 1970); *Esteban v. Central Missouri State College,* 415 F.2d 1077 (8th Cir. 1969), *cert. den.,* 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir.), *cert. den.,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); See *Goss v. Lopez,* 419 U.S. 565, 576, n. 8, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992,

43 L.Ed.2d 214 (1975). This Court has stated the requirements of due process in expulsion cases:

First, the student should be given adequate notice in writing of the specific ground or grounds and the nature of the evidence on which the disciplinary proceedings are based. Second, the student should be given an opportunity for a hearing in which the disciplinary authority provides a fair opportunity for hearing of the student's position, explanations and evidence. The third requirement is that no disciplinary action be taken on grounds which are not supported by any substantial evidence. *General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Learning,* 45 F.R.D. 133, 147 (W.D.Mo. en banc 1961).

Plaintiff concedes that the disciplinary procedures contained in the Student Handbook of NMSU comply with these requirements. However, he contends that the University failed to follow those procedures, and that this departure from an otherwise adequate method of expulsion constituted, in itself, a denial of due process.

It is apparent that the procedures followed in this case did not comply with those provided in the Student Handbook. After being acquitted on certain charges of misconduct by the Student Faculty Disciplinary Committee, plaintiff was advised that a second hearing would be held before the Board of Regents to consider several of the same charges of misconduct along with other new charges. A *de novo* hearing before the Board of Regents simply is not contemplated under the regulations adopted by the University in its Student Handbook.[2]

---

2. The Student Handbook provides, as part of a "Student Bill of Rights" that:

Any student accused of an offense against university rules shall have the right to a speedy hearing by an impartial disciplinary committee with students comprising at least half the membership. [Handbook at 17].

In addition the Handbook contains a description of the procedures to be followed in any student disciplinary case. Although it is

At the outset, it should be emphasized that plaintiff does not contest the adequacy of the notice and hearing afforded by the Board of Regents. Rather, plaintiff contends that "when an organization creates procedural protections for its membership, those procedures must be adhered to in order to preserve a member's right to due process of law." (Plaintiff's Suggestions at 9). While we agree that any governmental organization should follow its own procedures in dismissing a member, we cannot agree that the University's failure to follow its own rules on student discipline in this case constituted, in and of itself, a denial of plaintiff's constitutional right to due process of law.

The primary case upon which plaintiff relies is *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). In 1951 John S. Service was discharged by Secretary of State Dean Acheson after some sixteen years as a Foreign Service Officer. The method of discharge, however, was contrary to the applicable Regulations promulgated by the Secretary;[3] the Supreme Court held that "under the *Accardi* [*v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954)] doctrine petitioner's dismissal cannot stand . . ." [Id. at 388, 77 S.Ct. at 1165]. *Accardi* established the principle that a federal executive agency must follow its own regulations on procedure if its actions are to be sustained.[4] Plaintiff argues that *Service* established a constitutional rule making it a denial of due process for a government organization to act contrary to its regulations in a dismissal proceeding. We disagree.

*Service* enforced a rule of administrative law that the government must follow duly promulgated regulations

---

not entirely clear, it appears that any serious disciplinary infraction that could result in dismissal or expulsion from the University must be referred to the Student-Faculty Disciplinary Committee. The Handbook provides that the Student-Faculty Disciplinary Committee "is the only Committee that can recommend dismissal or expulsion from the university." [Handbook at 14].

If the student is found guilty by the Student-Faculty Committee, then he may appeal to the Appeals Board composed of the Vice-Presidents of the University [Handbook at 14]. No provision for appeal by the University in cases where the student has been acquitted of all charges is contained in the Handbook.

The Handbook also provides that "either party may petition the original hearing board to reopen the matter upon the discovery of new evidence." [Handbook at 15]. Finally, the Handbook states that "all dismissals or expulsions are reviewed by the President of the University before such action becomes final." [Handbook at 10].

3. Plaintiff argues that the factual circumstances of this case and those involved in *Service* in regard to the method of dismissal are similar. In *Service* the Court construed the State Department Regulations to mean that after a hearing before the Department's Loyalty Security Board, a decision by the Deputy Under Secretary favorable to the employee would be final and that thereafter

the Secretary was without authority to dismiss the employee. Service, however, had been discharged by the Secretary after a favorable decision by the Deputy Under Secretary who had approved the findings of the Loyalty Security Board.

The Secretary had discharged Service pursuant to the recommendation of the Loyalty Review Board of the Civil Service Commission before whom a second hearing had been held. By Regulation, however, hearings before the Loyalty Review Board were provided only *after* an adverse decision by the Secretary. Thus, Service's discharge was contrary to the procedure established in the Regulations.

4. In *Accardi* the Attorney General by regulation had vested his discretion to pass on applications for suspension of deportation in the Board of Immigration Appeals. In a habeas corpus action petitioner claimed that the Attorney General had violated that regulation and dictated the decision of the Board by placing petitioner's name on a list of persons he wanted deported which was transmitted to the Board. The District Court, without holding a hearing, summarily denied petitioner's habeas corpus application, and the Court of Appeals affirmed. The Supreme Court reversed, holding that the petitioner would be entitled to a new hearing before the Board if his allegation of undue influence by the Attorney General contrary to Department regulations was true.

that have "the force and effect of law . . . ." *Accardi v. Shaughnessy,* *supra,* 347 U.S. at 265, 74 S.Ct. at 502. It did not, however, hold that the failure to follow those regulations gives rise to a constitutional claim for denial of due process. In *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), the Court, following *Service* again, invalidated the dismissal of a government employee by the Secretary of the Interior for failure to follow departmental regulations.

> Because the proceedings attendant upon petitioner's dismissal from government service on grounds of national security fell substantially short of the requirements of the applicable departmental regulations, we hold that such dismissal was illegal and of no effect. [Id at 545, 79 S.Ct. at 975]

The Court, as in *Service,* expressly refused to consider the constitutional validity of the procedures for dismissal. *Id* at 540, 79 S.Ct. 968. Mr. Justice Frankfurter, concurring in this part of the Court's opinion but dissenting as to other parts, stated the basis of the *Service* rule:

> An executive agency must be rigorously held to the standards by which it professes its action to be judged. See *Securities & Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 87–88 [63 S.Ct. 454, 459, 87 L.Ed. 626]. Accordingly, if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. See *Service v. Dulles,* 354 U.S. 363 [77 S.Ct. 1152, 1 L.Ed.2d 1403]. *This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so.* He that takes the procedural sword shall perish with that sword. Therefore, I unreservedly join in the Court's main conclusion, that the attempted dismissal of Vitarelli in September 1954 was

abortive and of no validity because the procedure under Department of the Interior Order No. 2738 was invoked but not observed. [Id at 546–47, 79 S.Ct. at 976 (Emphasis added)].

We find and conclude that plaintiff's reliance upon *Service* is misplaced. The Court in *Service* did not announce a constitutional rule that would support a claim for relief under § 1983. We turn then to the other cases cited by plaintiff for the proposition that any deviation by a governmental organization from established procedures for dismissal amounts to a constitutional violation.

### III.

In *Behagen v. Intercollegiate Conference of Faculty Reprsentatives,* 346 F.Supp. 602 (Minn.1972), two student athletes at the University of Minnesota were barred by the Big Ten Athletic Conference from practicing with the Minnesota basketball team on account of participation in an altercation during a Big Ten conference game. The Court found that due process applied to such a suspension and that the Conference had not followed its own procedures by imposing the sanction against plaintiffs without granting them a hearing before the Directors of Athletics. This action was deemed improper by the Court and the Big Ten was enjoined from prohibiting plaintiffs to practice with the team "until such time as hearings which meet minimum standards of due process are held" [346 F. Supp. at 607].

The *Behagen* case, however, does not support the notion that in all situations it is a violation of due process for an organization to deviate from its established procedures. On the contrary, *Behagen* stands for the proposition that a person is denied due process when a state related organization deviates from its constitutionally sufficient hearing procedure and imposes a significant sanction such as suspension *without benefit of notice and hearing.*

**830**

The absence of any notice and hearing prior to the suspension from basketball practice was the due process violation in *Behagen.*[5]

Plaintiff also calls attention to *Warren v. National Association of Secondary School Principals*, 375 F.Supp. 1043 (N.D.Tex.1974), where a student was dismissed from the National Honor Society at his high school. Although the Court found that plaintiff had been given constitutionally sufficient notice of the charges and a hearing before the faculty council, it nonetheless enjoined the dismissal on the ground that plaintiff had been denied the opportunity to have his case heard by a fair and impartial tribunal. The tribunal in that case was composed of three faculty members, one of whom was the principal accusing witness. The court noted that the Honor Society's failure to follow its own regulation in two minor respects was an "additional problem" but it did not find this deviation from established procedure to be a constitutional violation. Rather, the failure to grant plaintiff a hearing before an impartial tribunal rendered the dismissal constitutionally defective.

In each of the cases cited by plaintiff the constitutional violation found by the court was not the mere failure of the educational institution to follow its own procedures, but the fact that the procedure eventually used by the institution was lacking in some element of due process. Indeed, several courts have upheld dismissal or suspension of students where the educational institution followed a procedure which, while contrary to its regulations, comported with the requirements of due process. See *Sill*

*v. Pennsylvania State University*, 462 F.2d 463, 469–470, (3rd Cir. 1972); *Center for Participant Education v. Marshall*, 337 F.Supp. 126, 136 (N.D. Fla.1972); *Bistrick v. University of South Carolina*, 324 F.Supp. 942, 949–52 (D.S.C.1971). In *Winnick v. Manning*, 460 F.2d 545 (2d Cir. 1972), the Court of Appeals for the Second Circuit, when confronted with a similar claim, found that a university's alleged departure from its own regulations did not constitute a denial of due process:

> Winnick contends that the University's failure to follow its own procedural guidelines deprived him of his right to due process. However, we are not inclined to hold that every deviation from a university's regulations constitutes a deprivation of due process. Here the alleged deviations did not rise to constitutional proportions and did not constitute in themselves a denial of due process. [Id at 550]

Plaintiff in this case concedes that the hearing before the Board of Regents was conducted in accordance with the requirements of due process. Moreover, the Board of Regents of NMSU is empowered by state law to enforce all rules and regulations governing student conduct, V.A.M.S. § 174.120 (1965). Therefore, we find and conclude that the deviation from university regulations in this case did not result in any deprivation of plaintiff's right to due process prior to his expulsion. We also find and conclude that the mere departure from the university regulations, standing alone, did not constitute a deprivation of any constitutional right possessed by plaintiff.[6]

---

5. *McDonald v. National Collegiate Athletic Associates*, 370 F.Supp. 625 (C.D.Cal.1974), is similarly inapposite because two students in that case were declared ineligible to participate in intercollegiate athletics by their University without any hearing whatsoever. Injunctive relief was ordered by the Court on the basis of this failure to accord plaintiffs their due process right to a hearing in contravention of the University's own disciplinary procedures.

6. In addition to the due process claim plaintiff asserted in his complaint that he was denied equal protection by the method of expulsion. However, plaintiff did not brief this issue. Therefore, we are unable to discern the basis of this claim, and, accordingly, we must treat it in the same manner as plaintiff's due process claim.

## IV.

■ Belatedly, in his Reply Brief, plaintiff suggests that the decision of the Board of Regents is not supported by substantial evidence. Recently, some doubt has been cast on the applicability of the substantial evidence test in this context. See *Wood v. Strickland, supra; McDonald v. Board of Trustees,* 375 F.Supp. 95 (N.D.Ill.1974), aff'd. per curiam, 503 F.2d 105 (7th Cir. 1974); but see *Scoggins v. Lincoln University,* 291 F.Supp. 161 (W.D.Mo.1968); *General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Learning, supra;* at 147–48.[7] We find no merit, however, in plaintiff's contention. The voluminous transcript in this case contains evidence that adequately supports the determination of the Board to expel plaintiff. See *Esteban v. Central Missouri State College, supra.*

Plaintiff also alleges that the regulations proscribing certain conduct and under which he was charged are vague and overboard. However, the Eighth Circuit Court of Appeals has recognized that some degree of breadth is necessary in student conduct regulations, and that they are not to be compared with criminal statutes. *Esteban v. Central Missouri State College,* supra, at 1087–89; 1. c. *General Order, supra,* 45 *F.R.* D. at 146–47. Under the standards applied to those regulations, we find and conclude that they are reasonably specific and do not infringe on any constitutionally protected right.

In conclusion, we feel compelled to emphasize that what we have said so far does not mean that we approve the practice of disregarding rules established for the express purpose of governing student disciplinary procedures. If the procedures are inadequate or ineffective, they should be changed. As long as the rules are permitted to stand, they should be followed by the administration as well as by the students. We believe that *Service* and the other loyalty-security cases demonstrate the danger of ignoring established procedures in favor of *ad hoc* approaches. While such approaches may pass constitutional muster, they do not support a finding that the institutional law applicable to student disciplinary matters will be followed and applied to all cases regardless of the circumstances.

Accordingly, it is

Ordered (1) that plaintiff's motion for summary judgment should be and the same is hereby denied. It is further

Ordered (2) that defendant's motion for summary judgment should be and the same is hereby granted.

## APPENDIX

### Regulations

### Statement of Policy

Northwest Missouri State University assumes that students are in attendance for the purpose of obtaining an advanced education. In order to provide the most effective environment in which this goal can be achieved, the University expects all students to conduct themselves in such manner that they do not interfere with the rights and privileges of other students or staff members and that they

7. In *Wood v. Strickland, supra,* the Eighth Circuit Court of Appeals found that two high school students were denied substantive due process in an expulsion proceeding because no evidence was presented to establish a violation of a school rule prohibiting possession of intoxicating beverages. 485 F.2d at 190. The Supreme Court, while reserving the question of the applicability of substantive due process in school discipline cases, reversed, finding that there was evidence to support the violation charged. 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214. The Court remanded for consideration of procedural due process questions. Id. On remand, the Eighth Circuit held that plaintiffs' right to procedural due process was violated in that they were not given adequate notice of the charges against them or a meaningful opportunity to rebut those charges. *Strickland v. Inlow,* 519 F.2d 744 (8th Cir., 1975).

show the same consideration which they expect from others. To this end, the University has established certain regulatory measures to help the students better understand and assume all responsibilities relative to their behavior.

To the extent that experience has shown the students to be capable of self-government, students, faculty, and combined student-faculty government bodies have been established to deal with the behavior of students who indicate by their behavior that they have not assumed the responsibilities of campus citizenship.

As part of the Residence Hall areas, Student Government Associations and/or Councils have evolved. Jurisdiction of these Councils relates primarily to discipline cases arising within their sphere of organization and activity. If these Councils are faced with behavior which seems to warrant dismissal or expulsion from the University, such cases are sent to a Student-Faculty Discipline Committee for final recommended action. All dismissals or expulsions are reviewed by the President of the University before such action becomes final. The Dean of Students is charged with presenting serious disciplinary cases to the Student-Faculty Discipline Committee and the presentation of all evidence pertaining to each case.

The Vice President of Student Affairs is charged with dealing in cases involving academic dishonesty or falsification of official University records. Such acts are governed by a possible automatic dismissal action, subject to review by the President of the University.

Each case is considered on its individual merit. Thus, each student is assured of a hearing before final action is taken. In the absence of students during holidays or summer recesses, the faculty members of the Student-Faculty Discipline Committee are empowered to act on behalf of this Committee in cases requiring urgent decisions. The faculty members are also empowered to act alone when consideration of a case would lead to recrimination or other repercussions against the student members of this Committee.

It is hoped that the above policies, which normally deal with a very small segment of the University population, can provide an atmosphere of honesty and consideration within which the welfare of the group is fostered and protected.

## Disciplinary Actions

The listed disciplinary actions are courses of action which may be taken when a student deviates from the expectations set forth in the residence halls or on the University campus. The action taken depends upon the severity of the violation, the degree of involvement, and the individuality of the student. These actions and their descriptions shall serve as guidelines for the University judicial system and may be modified and used in any combination to meet the needs of the individual student involved.

1. **Acquittal:**
   a. The student is found not to be responsible for the charge against him.

2. **Conduct Warning:**
   a. The action is a verbal warning about conduct which has been judged to be disruptive or injurious to the student or others.
   b. A thorough explanation of the policy is given.
   c. The student is instructed that further need for discussion in these areas are as, (Point B) could be cause for disciplinary action.

3. **Hall Probation:**
   a. This is a formal probationary status for a period of time specified by the court.
   b. Any further violation of university or residence hall standards while on probationary status subjects the student to further disciplinary action.

c. Parents are not notified.

4. **Restricted Hall Probation:**
   a. This is a formal probationary status for a period of time as specified by the court.
   b. Restrictions, provisions, and/or assigned duties are individualized to allow for the particular needs of the student and the situation.
   c. Any further violation of university or residence hall standards while on probationary status subjects the student to further disciplinary action.
   d. Parents are not notified.

5. **Dismissal from the Floor:**
   a. The student is removed from his floor.
   b. The court shall state the terms of this removal as well as the length of time this change shall remain in effect.
   c. Parents are not notified.
   d. Any further violation of university or residence hall standards subjects the student to further disciplinary action.

6. **Transfer of Students:**
   a. The student is transferred to another hall.
   b. The court shall state the terms of this removal as well as the length of time this change shall remain in effect.
   c. Parents are notified.
   d. Any further violation of university or residence hall standards subjects the student to further disciplinary action.

7. **Campus Conduct Probation:**
   a. This is a formal probationary status for a period of time as specified by the court.
   b. Restrictions and provisions of this probation are individualized to allow for the particular needs of the student and/or situation.
   c. The student may be prohibited from holding office in extracurricular clubs, governing groups, and activities.
   d. Any further violation of residence hall standards or university regulations while on probationary status means that a student subjects himself to further disciplinary action.
   e. Parents will be notified.

8. **Strict Campus Conduct Probation:**
   a. This action is a formal probationary status during which the student is removed from good standing at the University for an indefinite period of time.
   b. This term describes a set of conditions making it possible for a student to remain a student in residence hall and/or university in spite of some violation of the established standards of conduct.
   c. This status is very near suspension from the residence halls and/or from the university, and indicates the extreme seriousness of the probation.
   d. The student will be prohibited from holding office in extracurricular clubs, governing groups, and activities.
   e. Any further violation of university or residence hall standards while on a probationary status means that a student subjects himself to suspension from the residence halls and/or the University.
   f. The student must apply in writing to the chairman of the conduct committee that heard his case to be removed from Strict Campus Conduct Probation and returned to good standing as a student.
   g. Parents will be notified.

9. **Dismissal from the Residence Halls**

10. **Dismissal from the University:** The student shall be dropped immediately from the University for a period of time to be designated by the Student-Faculty Disciplinary Committee. (A two-thirds vote is required). A record of this action is to go to the student and a copy to his parents or guardian and the student's record to indicate, "Dismissed for disciplinary reasons" and date of this action. A copy of this action shall be placed in the student's personnel file in the Dean of Students Office.

11. **Expulsion from the University:** The Student shall be eliminated from the student body immediately as recommended by the Student-Faculty Discipline Committee, without possibility for re-application for admission to the University and to be so indicated in the student's personnel file and that record remain there indefinitely. (A two-thirds vote is required). A copy letter of this action shall be sent to the student and his guardian; and a copy to the student's personnel file in the Dean of Students Office.

The various conduct committees in the university judicial system have the right to assign disciplinary actions which they consider appropriate for the student and the situation. The above mentioned disciplinary actions are merely suggested guide lines. The committees are not restricted to only these actions but may use any action they feel is appropriate (e. g., a fine or monetary restitution).

## Powers of Disciplinary Committees

The most important principles which guide the board in choosing sanctions are:

1. They should relate to the gravity of the offense.

2. They should relate to the area of activity or circumstances in which the offense occurred (e. g., residence hall, traffic, campus).

3. They should be non-academic, i. e., they may include payment of a fine or damages, loss of a privilege, or dismissal, but never loss of credit for academic work successfully completed.

## Residence Hall Disciplinary Committees

May not use any disciplinary action more severe than number 5.

## Inter-Residence Hall Council Disciplinary Committee

May not use any disciplinary action more severe than number 9.

## Student Court

May not use any disciplinary action more severe than number 9.

## Student-Faculty Disciplinary Committee

May use all disciplinary actions. This is the only Committee that can recommend dismissal or expulsion from the university.

## Discipline Committee Procedure

To insure due process of discipline cases the following procedure will be followed by the various discipline committees of Northwest Missouri State University:

Case or situation is discovered—

1. The chairman of the discipline commitee hearing the case is notified.

2. The chairman appoints, at random, a member of his committee to investigate the situation.

3. The chairman and the committee advisor inform the accused, in writing, of the meeting time and date of the discipline committee and the charges against the accused. The advisor to the committee will inform the accused that he has the right to bring witnesses in his behalf. The accused will be allowed sufficient time to prepare his defense. (Three days

for Residenec Hall Discipline Committee, four days for Inter-Residence Hall Council Discipline Committee or Student Court, and five days for Student-Faculty Discipline Committee).

## Discipline Committee meeting—

1. The chairman will introduce everyone. (Committee, Advisor, Investigator and Accused)

2. The Chairman will have the investigator read the charges.

3. The Chairman will ask the accused how he pleads.

4. The Chairman will have the investigator present witnesses.

5. The Chairman will ask the accused to present any evidence pertaining to the case and to present any character witnesses.

6. The Committee may ask questions at this time.

7. The Chairman will invite any more comments from the investigator and the accused.

8. The accused and the investigator are excused from the room to wait until recalled.

9. The Committee discusses the case and decides if the accused is guilty or not. If guilty, then the Committee decides on an appropriate sanction.

10. The Accused and the Investigator are recalled and the Chairman discloses the findings of the Committee.

11. The Chairman explains to the guilty person the appeal procedure.

Note: The Accused and the Investigator are present for all presentation of the charges and evidence. The witnesses are present only for their testimony.

## Appeal

Any student, found guilty, by any of the discipline committees has the privilege of appealing his case.

In cases involving Residence Hall Discipline Committees, Inter-Residence Council Discipline Committee, and Student Court the appeal will be considered by an Appeals Board consisting of students appointed by the Student Body President and approved by the Student Senate.

In cases involving the Student-Faculty Discipline Committee, the appeal will be considered by an Appeals Board consisting of the Vice-Presidents of the University.

## Procedure

If a person wishes to appeal a decision of a discipline committee he must present his appeal, in writing, within 24 hours after he has been informed of the decision by the disciplinary committee.

In cases involving the Residence Hall Discipline Committees, the Inter-Residence Council Discipline Committee and the Student Court, the appeal should be given to the Director of Housing and Administrative Affairs or the Dean of Students.

In cases involving the Student-Faculty Discipline Committee the appeal should be given the Dean of Students.

## Appeal Board

The "right" of appeal does not entitle a student to a full re-hearing of his entire case. Rather, the appeal board should limit its review of the hearing board's record to three issues:

1. Did the hearing board conduct itself in such a way that the accused had an adequate opportunity to prepare and present his defense? (i. e., did he receive "DUE PROCESS");

2. Was the evidence presented at the hearing "substantial" enough to justify a decision against the student;

3. Was the sanction imposed in keeping with gravity of the wrongdoing?

The matter should not even come to the appeal board unless the accused presents the board with a written complaint touching on one or more of the issues mentioned above. The appeal board should limit its inquiry to the issue, or issues, put forward in that complaint. The appeal board may—in its discretion ask both sides to make an oral presentation.

The appeal board may accept the report and decision of the hearing board, reverse the hearing board's decision and return the case to that board for further hearings in keeping with suggestions that the appeal board may make, or reverse the hearing board's decision and dismiss the case. They may also accept the decision of the hearing board, but reduce the sanction imposed. They may not increase the sanction. Returning the case to the hearing board is not double jeopardy since the first hearing is still not complete.

If the appeal board accepts the report of the hearing board (whether it lowers the sanction or not), the matter is deemed final; except that either party may petition the original hearing board to reopen the matter upon the discovery of new evidence. The hearing board will judge the sufficiency of the new evidence, and no appeal can be taken from their decision.

### Offenses

1. Fraudulent entries on official records.

2. Academic dishonesty (e. g. cheating on tests or examinations.)

3. Theft.

4. Consumption or possession of alcoholic beverages anywhere on the university campus.

5. The use, possession, or distribution of narcotic drugs, stimulants, barbiturates, and hallucinogenic drugs unless prescribed by authorized physician.

6. Possession of dangerous weapons without proper authorization and safe storage. (e. g. guns, switchblades, hunting bows, etc.)

7. Destroying, damaging, or defacing private or University property.

8. Entering the room or any unauthorized living area of a member of the opposite sex who resides in university housing at other than approved hours.

9. Persistently irresponsible behavior by a student after repeated warnings by University authority.

10. Any group behavior which causes damage to private or University property; physical injury; disrupts classes, organized meetings or official University functions.

11. Gambling.

12. Violation of State or Federal law.

The University reserves the right to inspect residence hall rooms for the possession of illegal articles. An inspection must be approved by the director of the hall who will supervise the inspection. Every attempt possible will be made to have the resident or residents of the room present during the inspection. Prior to the commencement of the inspection the student will be given the opportunity to declare any illegal articles in his possession.

Off-campus authorities will not enter a student's room without permission from the Student Personnel staff or without a search warrant.

## STUDENT BILL OF RIGHTS

### Preamble

At an institution of higher learning, the pursuit of knowledge and attainment of mature attitudes can be greatly facilitated by freedom of expression and participation in decision making. Students need to be informed of their positive rights under the law as well as their obligations. Therefore, in order to promote education, encourage responsibility, and guarantee the rights of the students, we establish the following Bill of Rights. It is expected that the students shall exercise these rights with maturity and responsibility and that they shall not be used as an excuse to infringe on the rights of others. No right enumerated in this bill shall be construed to be in conflict with the goals of the university or local, state, or national laws.

### Academic Requirements

1. The student has the right to accurate and plainly stated information which enables him to clearly understand:

    a. The general qualifications for establishing and maintaining an acceptable academic standing.

    b. The graduation requirements for his particular curriculum and major.

    c. The procedural course requirements set by the individual instructors for their course.

### Disclosure of Information

2. The student has the right to protection against disclosure of information which is not a matter of public record. Such information, including personal values, beliefs, memberships, or political associations, shall be considered privileged and confidential. Information concerning the student contained in medical, counseling, academic, and disciplinary records, shall not be disseminated without a student's express consent. This is to except faculty members and administrators who may do so upon expressing a valid reason to the person in charge of the record.

### Student-Teacher Relationships

3. Students have the freedom to take reasoned exception to any data or any viewpoint expressed by an instructor. However, in exercising this freedom, students should not interfere with the academic process of the class. Students have the right to be evaluated accurately and fairly in their academic performance, and not on their opinions, per se, controversial or otherwise, that may be expressed in or outside of class.

4. Students have the right to discuss their academic performance with their instructors. Students who feel they have been evaluated unfairly by the instructor have the right to an appeals procedure which shall be made known to them.

### Freedom of Expression

5. Students have the right to both establish and issue student-directed publications by registering with the Student Senate. The Senate will determine whether registration will be granted and if it will be withdrawn. This registration will consist of:

    a. Submission of a written and signed statement of the objectives and standards of the publishers and the faculty sponsor, to be approved by the Student Senate; and

    b. The signing of the statement that the editors and staff will not violate any civil law, and

that material to be published must be approved by the publication's faculty sponsor.

The faculty sponsor will be responsible for the publication's conformity to civil law and to the stated objectives and standards of the publication. The faculty sponsor will also be responsible for exercising his judgment to maintain reasonable standards of good taste.

6.  Students have the right to express their opinions publicly on any subject. Students may invite individuals who are not members of the academic community to speak on campus, provided they are sponsored by a recognized campus organization and approved by the Student Senate. In exercising freedom of speech on this campus, strict adherence must be given to the regulations of civil law.

7.  Dress and grooming are modes of personal expression and taste which shall be left to the individual student except for reasonable requirements related to health and safety.

8.  Freedom of assembly shall be guaranteed to all unless it involves behavior which causes damage to private or university property; physical injury; disrupts classes, organized meetings, or official university functions. Arrangements for these assemblies should be made through the Office of the Dean of Students.

9.  Students have the right to petition for a redress of grievances.

## Discrimination

10.  Students shall not be discriminated against in any activity or organization recognized by the university because of race, creed, sex, or religious beliefs. All members of the university community should endeavor to insure against discrimination through word and action.

## Search and Seizure

11.  No student residence shall be entered other than by or in accompaniment of personnel staff or administration member and then only after first obtaining consent of student or approval of the hall director or approval of the Student Personnel Office Staff. This privilege is subject, however, to entry gained by virtue of other legal authority.

## Campus Organizations

12.  Any group of students may become a recognized campus organization upon approval of their constitution by the Student Senate and Faculty Council. Recognition shall be denied only if the group's goal and purposes are inconsistent with civil law, university policy, and the NWMSU Student Bill of Rights.

## Disciplinary Actions

13.  Any student accused of an offense against university rules shall have the right to a speedy hearing by an impartial disciplinary committee with students composing at least half the membership. The student shall be informed of the offense, shall be allowed a reasonable time to prepare an answer to the charges and at a formal disciplinary hearing be afforded the opportunity to present witnesses, question witnesses against him. He shall further be allowed to be represented by any member of the academic community. The students shall have the right to appeal the decision.

14.  Students shall not be subject to disciplinary action by the university solely for conviction in civil court.

## Students As Private Citizens

15.  It is the right of every student to freely exercise his full rights as

a citizen. He may participate in off-campus activities singly or with any group, for any legal purposes, provided he does not officially represent the university.

## Article V

### Committees

Section 1. The following committees have been established for the purpose of carrying out disciplinary policies and hearings related to charges brought against members of the Association. Such policies

are established and can be changed only by action of the Board of Regents of the University. The Senate can recommend changes and modifications through the President of the University.

a. The Student-Faculty Discipline Committee is composed of four students, which may include the President and/or Vice-President of the Student Senate and two other student senators selected by the President of the Student Senate and four faculty members and a faculty chairman to be selected by the President of the University. The student members must be approved by the President of the University.

b. The Student Court is composed of six student members and a. student chairman appointed by the Student Senate. The student members must have an accumulative grade point of 2.0 (4.0 = A), and must be approved by the President of the University.

c. The Traffic Court is composed of five student members appointed by the Student Senate. The chairman will be the Vice-President of the Student Senate. The student members must have a cumulative grade point average of 2.0 (4.0 = A) and must be of junior or senior rank.

d. The Student Appeal Board is composed of five students, one of them being from the Senate as Board Chairman. The President of the Senate shall select the members with approval of the President of the University. The student members must have a cumulative

grade point average of 2.0 (4.0 = A) and must be of sophomore rank or higher.

Section 2.  Union Board

a.  There is hereby created a Union Board to be established and administered in keeping with the Constitution of the Union Board.

b.  Nothing in the Union Board Constitution shall be in conflict with the provisions of the Constitution and By-Laws of the Student Government Association or of the established regulations of the University.

Section 3.  Student-Faculty Affairs Committee

a.  This committee shall be composed of two members of the Student Senate, appointed by the President of the Association; two members of the Union Board, appointed by the Union Board Chairman; Dean of Students; and two faculty members appointed by the President of the University.

b.  The board shall meet when deemed necessary by the President of the University or any three of its members to discuss basic campus functions and improvements.