Ralph ESCOBAR, Jr., Plaintiff,

v.

STATE UNIVERSITY OF NEW YORK/COLLEGE AT OLD WESTBURY, and Edward S. Todd, Acting President, Defendants.

No. 77 C 110.

United States District Court, E. D. New York.

Feb. 25, 1977.

---

**14.** *See* Section 268 Equal Protection analysis, *supra.*

his suspension as a student at State University of New York/College at Old Westbury (the college), (b) to rescind measures already taken for implementation of the suspension, and (c) to enjoin defendants from instituting any further disciplinary procedures against him in relation to the charges already heard by the college's Judicial Review Committee.

Escobar, a 28 year old student at the college, is now one semester away from obtaining his Bachelor of Science degree. Defendant Todd, acting president of the college (President), on December 6, 1976 ordered him suspended but permitted him to complete the semester. Under a temporary restraining order granted by this court Escobar commenced classes on February 7, 1977 for his final semester. Argument of Escobar's motion for a preliminary injunction was heard on February 8, 1977 at which time the temporary restraining order was continued pending the court's determination of the motion.

The court has subject matter jurisdiction under 28 U.S.C. § 1343(3) to adjudicate plaintiff's claim for injunctive relief under 42 U.S.C. § 1983 since expulsion from a state school must comport with requirements of due process. *Winnick v. Manning*, 460 F.2d 545 (C.A.2 1972); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

While the action is properly brought against defendant Todd who, as acting president of the college, is its chief administrative officer charged with responsibility for enforcement of the college's disciplinary procedures, Rules § 535.7(a), the action must be dismissed against the college itself since it is not a "person" within the meaning of 42 U.S.C. § 1983. *Blanton v. State University of New York*, 489 F.2d 377, 382 (C.A.2 1973).

There are no contested issues of fact, and the parties have agreed that disposition of the preliminary injunction motion will dispose of the issues necessary for final adjudication of the action. Accordingly, trial of the action on the merits has been advanced and consolidated with the hearing of the

Gladstein, Meyer, Reif & Siegel, Brooklyn, N. Y., for plaintiff.

Louis J. Lefkowitz, Atty. Gen., Emanuel M. Kay, Asst. Atty. Gen., New York City, for defendants.

## MEMORANDUM AND ORDER

PRATT, District Judge.

In this 42 U.S.C. § 1983 action plaintiff Escobar seeks (a) to enjoin preliminarily and permanently defendants' implementing

application for preliminary injunction, and this decision constitutes the court's final determination of the issues in this action.

At the center of this dispute lie two sets of disciplinary regulations and procedures. One of them, "The Rules of Public Order" (Rules) were adopted by the Board of Trustees of the State University of New York in compliance with the requirements of the state Education Law. Originally adopted on June 18, 1969 and amended on July 10, 1969, April 9, 1970 and April 29, 1970, they constitute Part 535 of Subchapter C, Chapter V, Title 8 of the Official Compilation of Codes, Rules and Regulations of the State of New York. The Rules apply to all branches of the State University throughout the state.

The other set of disciplinary regulations and procedures is "The Code of Community Conduct for Students" (Code) which was developed by and for the Old Westbury College community and approved by the College Council, an official body appointed by the Governor.

The Code is divided into two parts: (1) Code of Community Conduct for Students and (2) Violations of Code of Community Conduct. For convenience these will be cited respectively as Code # 1 and Code # 2. In the text discussion, however, they will be referred to collectively as the Code.

In broad outlines Escobar claims that since he was subjected to a hearing and disciplinary action under the Code, he may not be subjected to the purported action taken by the President under the Rules. Alternatively, Escobar argues that even if the President was entitled to invoke the Rules, he did not follow the requirements of those Rules with the result that the President's action against him is invalid. Either way, Escobar claims, he has been denied due process of law.

Defendants' argument is cast in jurisdictional terms. They urge that the Rules, which emanate from the state trustees, supersede the Code, which is adopted by the local college council, with the result that any matter which might properly fall within the Rules does not lie within the Code's jurisdiction. Defendants also argue that even if the college regulations were not followed, plaintiff nonetheless was actually accorded due process of law and therefore may not obtain relief from a federal court.

## I. FACTS.

Prior to November 2, 1976, plaintiff's misconduct at the college had received official attention on several occasions. His records show a series of incidents dating back to March 11, 1975 which included verbal abuse, threats, breaking of windows during fits of temper, drunkenness and difficulties with the security officers.

On November 2, 1976, plaintiff argued with a professor in the education program, threatened violence and used abusive language. As a result of that incident, a complaint was filed against him under the Code, and a hearing was held before the Judicial Review Committee on November 9, 1976 covering charges on the November 2, 1976 incident and some of the prior incidents.

After a full hearing the findings and recommendations of the Judicial Review Committee were reported to the Dean. There seemed to be no dispute over the basic facts. The recommendations by the Judicial Review Committee included a requirement that plaintiff formally apologize for his insulting remarks and abusive language on the occasion of the most recent offense, a direction that certain affirmative steps be taken toward helping plaintiff's adjustment and progress at the school, and a recommendation that should another similar incident occur the Dean should seriously consider either plaintiff's removal from the dorm or his outright dismissal from school.

Under the Code, when the Dean received these recommendations he had a choice of either implementing them or referring them to the Judicial Council. Plaintiff also had a right to appeal to the Judicial Council. Plaintiff did not appeal, and the Dean did not exercise his discretionary power to refer the matter. Plaintiff then began to comply with the recommendations of the Judicial Review Committee.

The President received his first knowledge of the November 2nd incidents and the proceedings before the Judicial Review Committee on or about November 19, 1976 when he received a copy of the report of the Judicial Review Committee's recommendations to the Dean. Based on his own recollection of other events involving the plaintiff, the President investigated further because he "questioned the substance and conclusions of the hearing". He discussed the matter with both Dean Clarke and Associate Dean James and on November 30th met with the Judicial Review Committee which had conducted the hearing. The President told the committee that his review of the records "obliged me to reject the recommendation of the panel in favor of the community's welfare". At the committee's request he listened to the tape recording of the hearing, but still remained convinced that the plaintiff should receive more severe sanctions than those imposed by the Judicial Review Committee.

On December 6, 1976 the President prepared his determination in which he required plaintiff to vacate his housing assignment no later than December 10, to avoid circumstances or situations that would evoke confrontations and hostilities with students or personnel of the college, and until the last day of the fall semester finals, to remain off campus except for specific class responsibilities or faculty appointments. The President's memorandum further suspended plaintiff from all college activity with the close of the fall semester until upon written permission he might be permitted by the President to re-enroll. The President's stated authority for action was a passing reference to the "Rules of Public Order" (Rules).

The President informed plaintiff in the December 6, 1976 memorandum that he was entitled to a preliminary hearing and, if requested, a formal hearing.[1] Strangely,

the President's memorandum then says he would recommend his actions to the "Hearing Committee"[2] together with possible re-enrollment of the plaintiff on condition that he obtain professional psychiatric evaluation and help together with certain statements from a psychiatrist.

The following day, December 7, the President informed the Judicial Review Committee of his proposed action, which he had not yet made known to the plaintiff. The committee, however, questioned his authority to act in the manner he was proposing. Despite that disagreement, and even though his memorandum to the plaintiff indicated that the President's proposals were recommendations to the committee, the President nonetheless met with the plaintiff on December 8, reviewed the memorandum with him and had him sign it. That action was interpreted, reasonably, by Escobar as effecting his suspension from school. Plaintiff thereupon complied with the President's directions, and together with his wife and child vacated the dormitory accommodations.

Nothing in the evidence indicates or even suggests any malice or bad faith on the part of the President. There is simply a marked difference of opinion between him on the one hand, and the Judicial Review Committee and the Dean on the other, as to what is appropriate disciplinary action for this plaintiff. Normally, such a dispute would not invoke the jurisdiction of a federal court. The fundamental principles involved here, however, together with the drastic impact of the President's action upon the plaintiff, give rise to a constitutional issue as to whether due process of law has been observed in effecting plaintiff's suspension from the college.

To resolve that question, we must first review in detail the disciplinary procedures established by both the Rules and the Code.

1.  No authority has been cited for this procedure. It appears to have been adopted *ad hoc* by the President.

2.  This is a college body different from the Judicial Review Committee, which conducted Esco-

bar's hearing, and from the Judicial Council to which an appeal from the recommendations of the Judicial Review Committee could have been, but in fact was not, taken.

## II. COMPARISON OF THE RULES WITH THE CODE.

### A. *Overlapping Applicability.*

Section 535.3 of the Rules, entitled "Prohibited Conduct", itemizes types of conduct which is prohibited on premises of state-operated institutions of the State University. Article I of the Code, entitled "Protection of Rights and Property", describes certain rights of members of the university community, violation of which shall be prosecuted and punished under the Code's procedures.

Some conduct obviously would violate both the Rules and the Code. For example, one of the rights guaranteed by the Code is the right of faculty, students and staff "to be secure in their persons". Under the Rules, no person shall "willfully cause physical injury to any other person, nor threaten to do so". Rules § 535.3(a). One of the violations with which plaintiff was charged here was a threat of physical violence—clearly an infraction of both the Code and the Rules. A reading of the two sections discloses there are numerous other possibilities of conduct which would violate both the Code and the Rules.

Given these two separate bodies of regulations, which one should be invoked in a particular case to determine guilt and the appropriate discipline? Before considering that question, it is necessary first to analyze the procedures of both the Rules and the Code.

### B. *Rules v. Code Procedures.*

#### 1. *Complaint.*

Under the Rules, the President is required to cause an investigation to be made and written statements taken whenever a complaint is made to him or he has knowledge that a violation may have occurred. If he then has reasonable ground to believe that there has been a violation, he prepares and serves on the student written charges stating the provision in the Rules which has

been violated and setting forth the ultimate facts constituting the offense. Rules § 535.9(b).

Under the Code a disciplinary proceeding may be instituted by anyone by filing a written complaint with the Dean for Student Development (Dean) who must forward a copy of the complaint to the student. Code # 2 §§ I, II, IIIA. Unlike the President's authority under the Rules the Dean has no discretion in determining whether a Code complaint should be processed.

#### 2. *Temporary Suspension.*

Under the Rules if the President determines that the continued presence of the student would constitute a danger or pose an immediate threat of disruptive interference with the normal conduct of the institution's activities and functions, he may suspend the student simultaneously with service of the charges. The student, however, may on request receive an immediate hearing with respect to the basis for the suspension. Rules § 535.9(f).

Under the Code if the infraction is such that it may endanger the college community, the Dean may suspend the student pending a hearing. Code # 2 § IIIB.

#### 3. *Hearing.*

A Rules hearing is held before a Hearing Committee, consisting of two members of the administrative staff, two members of the faculty and three students "who shall be designated by the members named by the chief Student Government." [3] The administrative staff members and the faculty members of the Hearing Committee are designated by the President.

For a Rules hearing the President must in the notice of charges served on the student fix a date for the hearing not less than ten nor more than 15 days from the date of service. Rules § 535.9(d).

While technical rules of evidence do not control at the hearing, evidence received by

---

**3.** The meaning of the quoted language is not clear to the court. Presumably custom at the college has determined how the student members of the Hearing Committee are designated.

the Hearing Committee is to be relevant and material to the issues. The student may confront and examine witnesses against him and produce witnesses and other evidence in his own behalf. Rules § 535.-9(h).

A Code hearing is held before the Judicial Review Committee, which, like the Rules' Hearing Committee, consists of three students, two faculty and two staff members, with "each [to be] selected from their respective constituencies within the College". The Code does not say who does the selecting. Code # 2 §§ IIIB, IV.

The Dean has the responsibility to convene the Judicial Review Committee at the earliest possible date. Hearing procedures "should provide the fullest benefit of due process, including sufficient and clear notice of charges, adequate provisions for fair hearing and the mechanism for appeal and disciplinary actions." Code # 1 § III.

### 4. Decision and Appeal.

Both the Rules' Hearing Committee and the Code's Judicial Review Committee serve as fact finding bodies which make recommendations.

Within 20 days after the close of a Rules hearing, the Hearing Committee must submit a report of its findings of fact and recommendations for disposition of the charges to the President, together with a tape of the proceedings. The President must then within ten days make his determination. "Final authority to dismiss the charges or to determine the guilt of those against whom they are made and to expel, suspend or otherwise discipline them shall be vested in the [President]." Rules § 535.-9(i).

No provision is made for any appeal from the President's determination.

After a Code hearing, the Judicial Review Committee deliberates and within 24 hours submits written recommendations and findings to the Dean, Code # 2 § IVC, but the Code does not clearly state what is to follow those written recommendations and findings. It does state that the *student* shall have the right to appeal the commit-

tee's findings and recommendations to the Judicial Council, Code # 2 § V, which is still another body of similar makeup, *i. e.,* three students, two faculty and two staff members, but this one is selected by the College Assembly. Code # 1 § III. The Code also states that "the right of appeal at all levels in the judicial process will be respected", Code # 1 § III, and that "No appellate judicial body on the campus shall have the power to *increase* the sanctions imposed by the [Judicial Review] Committee", Code # 2 § VC (emphasis in original).

Apparently, the student's right of appeal is unlimited, but there are limitations upon the "right" of the administration to appeal a decision by the Judicial Review Committee. Specifically, the Code provides:

The Judicial Committee shall make recommendations directly to the Dean for Student Development. The Dean for Student Development will implement the recommendations or refer them, with comment, to the Judicial Council, which will advise the Dean for Student Development of its decision. The Dean for Student Development will implement the decision or may refer the matter to the President with comment and/or recommendation. The President of the College will act as the source of final decision. Civil rights of student members of the community will be respected. In matters involving discipline, students will have the right to counsel of their own choosing. The right of appeal at all levels in the judicial process will be respected. The President of the College will be the final source of appeal for disciplinary matters affecting students at the College at Old Westbury. Code # 1 § III.

The court interprets this language of the Code to mean that after the findings and recommendations of the Judicial Review Committee are given to the Dean, he will consider them and, if he agrees with them, will implement them. If the Dean disagrees *for any reason* he may refer the findings and recommendations to the Judicial Council with his comments. The Judicial Council may then review on the record

made before the committee, or it may consider new evidence. The Judicial Council notifies the Dean of its "decision". Again, the Dean may, if he agrees, implement the decision, or if he disagrees he may again refer the matter, this time to the President together with his comment and/or recommendation. If the matter is referred by the Dean to the President in this manner, then the President "will act as the source of final decision".

Viewing the appellate procedure from the student's side, the right of appeal "at all levels" is to be "respected". The clear intent of the Code is to grant the student a right to appeal first to the Judicial Council, and then if he is dissatisfied with the result of the Council's decision, a further right to appeal to the President who, the Code provides, "will be the final source of appeal for disciplinary matters affecting students at the College". In short, the student has a right to appeal both to the Judicial Council and to the President.

The complainant or the administration, on the other hand, have no such right to appeal. Absent an appeal by the student charged with the violation, further review of the recommendation by the Judicial Review Committee may take place only upon discretionary referrals by the Dean, first to the Judicial Council, and thereafter to the President. If the student is satisfied with the Judicial Review Committee's report of fact finding and recommendation and if the Dean decides to implement the recommendations, then under the provisions of the Code, the matter is ended. The President may act in proceedings followed under the Code only upon reference by the Dean, and even then only after the matter has been considered by the Judicial Council upon the Dean's referral.

### III.  RECONCILIATION OF THE TWO PROCEDURES.

In the Code and the Rules, the college has in effect two separate, frequently parallel, but distinctly different disciplinary procedures. Are these procedures mutually exclusive? Are they incompatible? Can they be reconciled?

Plaintiff claims that the Rules were adopted at a time of campus unrest and were designed to cover only such problems as campus sit-ins and other types of disruptive behavior. As a result, plaintiff argues, the Rules have no application to the ordinary, every day violations which may be committed on campus.

Unquestionably, the Rules were adopted under the circumstances argued by plaintiff; however, they are not limited to the type of conduct which plaintiff claims. They must be applied according to their terms which go far beyond violations related to mass demonstrations. Moreover, the Rules themselves provide that their enforcement procedures may be applied to "any rules adopted by an individual institution supplementing or implementing [these] rules", which means that the Rules procedures may be used to enforce violations of the Code even though those violations did not fall within the types of "prohibited conduct" defined in § 535.3 of the Rules.

Defendants argue that the Rules, having been adopted by the State Board of Trustees, supersede and preempt the Code as to any matters which fall within the scope of the Rules.[4] In support of this argument defendants point to various sections of the Rules, of the Code and of a brochure entitled "Codes for Campus Living" which is distributed to all students at the college. The Rules themselves provide that they may be "supplemented by additional rules for  *  *  *  any individual institution  *  *  *  *but only to the extent that such additional rules are not inconsistent herewith.*"  Rules § 535.2 (emphasis supplied). The introductory section of "Codes for Campus Living", which contains complete copies of both the Code and the Rules, provides that the Rules are "applicable to

---

**4.**  If defendants were correct on this, then the Code procedures could have no application since, as indicated in the preceding paragraph, the Rules procedures may also apply to Code violations.

all institutions of the State University of New York and take precedence over any local codes adopted by the individual colleges." "Codes for Campus Living" p. 1. Referring to possible circumstances where a violation might fall under the local code as well as the Rules, the introduction to the brochure states: "When this occurs, the violation will be processed under the Rules [which take] precedence as indicated above." "Codes for Campus Living" p. 1. In its own preface the Code provides: "this Code encompasses all behavior *not* subsumed by the Rules * * *." Code # 1 Preface (emphasis supplied).

If the court were to look solely to the language of these documents there would be much force in defendants' position that because of the superior position of the Rules, Code procedures may not be used by the college for any "prohibited conduct" described in the Rules. These documents, however, are part of the government of the college. They are more than mere words and must, therefore, be viewed in the light of their own use by the college community.

Despite the language indicating a preferential position for the Rules, until the Escobar incident all violations at the college had been previously processed under the Code. Escobar is the first disciplined student against whom the college has urged that the Rules should be applied. Simply because the college has not previously attempted to invoke the Rules procedures, of course, does not preclude it from doing so in any particular case. The duties and power of the President as chief administrative officer of the college under the Rules cannot be diminished or abandoned by mere nonexercise. However, acquiescence by the college in repeated use of Code procedures to conduct disciplinary proceedings which could also have been processed under the Rules argues strongly against the college's present claim that Rules jurisdiction is exclusive.

Based upon the evidence submitted and the provisions of both the Rules and the Code, the court finds that there are many violations which may at this college be prosecuted under either procedure. The two sets of regulations stand side by side, available for use as needed or desired in the discretion of the appropriate campus officials.

The obvious question at this point is how should the decision be made as to which set of regulations should be applied in a particular case. Although there is no direct guidance provided in either the Rules or the Code, the Rules do point out the need for "full and prompt communication among all components of the institutional community" in disciplinary matters, and urge that such communication "precede the exercise of the authority, discretion and responsibilities granted and imposed in these rules." It further directs the college to employ such procedures "as will promote such communication". Rules § 535.8. In addition, it is the President who is made responsible for enforcement of both the Rules and the Code. Rules § 535.7(a).

Since, under § 535.9 of the Rules, the President has the obligation to investigate whenever he has knowledge that a violation may have occurred, it would be a simple matter for the President to establish an administrative procedure whereby the Dean would notify him immediately whenever a complaint was filed with him under the Code. In that way the President could investigate at the outset in order to determine whether he wished to step in and invoke the Rules procedures. Since the Rules supersede the Code, the President's invoking of the Rules procedures would then preclude any further procedures under the Code.

On the other hand, if after receiving notice of a Code complaint the President fails to take action by the time that the Code hearing is commenced, then the President should be deemed to have waived his right to intervene in that particular case and should be precluded from taking any further procedures under the Rules.

█ Unless coordinated in such a manner these two sets of regulations could result in subjecting a student charged with an of-

fense to the burden and risks of two separate hearings for the same violation. Such a result does not comport with standards of due process and would not further the best interests either of the college or of the students.

## IV. APPLICATION OF PRINCIPLES TO THE PRESENT CASE.

■ When the foregoing principles and interpretations are applied to the present case, it is apparent that the action by the President in suspending plaintiff on December 6, 1976 cannot stand. The President's action cannot be sustained under the Code, since the plaintiff did not appeal to the President, nor did the Dean refer the matter either to the Judicial Council or to the President. Absent such referrals, the President had no power to act under the Code procedures. Indeed, defendants do not even attempt to justify Escobar's suspension order by reference to the President's powers under the Code.

Instead, defendants seek to support the President's action by reference to the Rules. As already indicated, however, since plaintiff had already been the subject of a hearing before the Judicial Review Committee under the Code procedures, the President no longer could exercise his Rules powers with respect to those violations which had been heard by the Judicial Review Committee.

Moreover, even if we assume the President had power to belatedly invoke the Rules, it is clear that he did not properly exercise that power, since he did not follow the requirements of the Rules themselves. The charges he made against the plaintiff were included in the same document which set forth the plaintiff's suspension and the terms for his possible readmission. Contrary to the Rules, the President did not convene the Hearing Committee, did not give notice of any hearing, and received no report from the Hearing Committee. There is no authority in either the Rules or the Code for substituting the hearing before the Code's Judicial Review Committee

for the one required to be held before the Rules' Hearing Committee.

Defendants have stated that if plaintiff desires a hearing before the Hearing Committee, he may have it at any time. Under the circumstances here, however, it is too late for such a procedure. The Rules specifically require that the hearing be not less than ten nor more than 15 days from the date of service upon the student of the charges against him. The 15 day maximum time for the hearing has elapsed. Moreover, a Rules hearing is not one to be convened only in the event the student requests it. Under the Rules such a hearing is mandatory; without it the President may not act.

■ Of course, not every deviation from a university's regulations constitutes a deprivation of due process. *Winnick v. Manning*, 460 F.2d 545 (C.A.2 1972); *Edwards v. Board of Regents*, 397 F.Supp. 822 (W.D.Mo.1975). But where, as here, an offending student has been formally charged under the college's disciplinary code, has been subjected to a hearing, has been officially sentenced, and has commenced compliance with that sentence, it is a denial of due process of law for the chief administrative officer to step in, conduct his own *in camera* review of the student's record, and impose a different punishment without complying with any of the procedures which have been formally established for the college. Here the President simply brushed aside the college's formal regulations and procedures and, without specific authority, imposed a punishment of greater severity than determined by the hearing panel, a result directly contrary to the Code's appeal provisions.

Thus, whether viewed from the point of view of the Code or the Rules, plaintiff has been denied due process of law by the President's suspension order dated December 6, 1976. His order is void, and the President, therefore, should be enjoined from implementing it. He should further be directed to readmit the plaintiff and his family, upon plaintiff's request, to dormitory ac-

commodations which are equivalent to those from which plaintiff was removed.

Plaintiff also has requested that the President be enjoined from taking any further disciplinary action based upon the matters which were the subject of the November 2, 1976 hearing before the Judicial Review Committee. For the reasons indicated above, no further disciplinary action should be instituted against the plaintiff based upon the violations with which he was previously charged in the Code proceeding and which were the subject of the Judicial Review Committee's hearing. That is not to say, however, that those incidents and the evidence developed at the hearing could not be used in determining appropriate punishment in the event that further disciplinary proceedings were to be brought against the plaintiff based upon conduct occurring subsequent to the time of the hearing before the Judicial Review Committee.

Defendant's counsel has raised a question as to whether a further incident regarding a parking ticket and a letter written by the defendant, attached to the President's affidavit as Exhibit H, might be used as the basis for separate disciplinary action against the plaintiff. In the interest of resolving the entire dispute between these parties, the court has reviewed the letter written by plaintiff and has concluded that while the language of the letter is intemperate, its meaning, fairly construed, is not one of a threat of physical harm, but instead is a plea for fair treatment lest the plaintiff, who openly acknowledges his frustration and who worries over his ability to control himself, may resort to improper measures in order to end what he views as official "harassment".

If further disciplinary action is to be instituted against the plaintiff, it must result from conduct which does not appear on the record presently before the court. Those matters which do appear in this record should be relied upon in future disciplinary matters only in determining what sanctions would be appropriate for a future violation should it occur.

SO ORDERED.