Nancy JONES, Plaintiff,

v.

The BOARD OF GOVERNORS OF the UNIVERSITY OF NORTH CAROLINA and its constituent institution the University of North Carolina at Charlotte; E.K. Fretwell, Jr., Chancellor of UNCC; James H. Werntz, Vice-Chancellor for Academic Affairs of UNCC; and Louise Schlachter, Dean of School of Nursing of UNCC, Defendants.

No. C-C-83-041-M.

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 4, 1983.

---

Jonathan Wallas and John T. Nockleby, Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., for plaintiff.

Thomas Ziko, Asst. Atty. Gen. of N.C., Raleigh, N.C., for defendants.

## MEMORANDUM OF DECISION AND PRELIMINARY INJUNCTION

McMILLAN, District Judge.

This case was heard on January 28, 1983, upon motion of the plaintiff for a temporary restraining order. At the hearing counsel agreed that they did not want to have more than one hearing on the merits. Since all parties have received timely notice and have been heard, the court is treating the motion as a request for a preliminary injunction. Jurisdiction exists under 28 U.S.C. §§ 1343, 2201 and 2202, and under 42 U.S.C. § 1983.

## I. FACTUAL BACKGROUND

The facts recited below are from the verified and undenied complaint and from the exhibits and record of the case.

Nancy Jones, plaintiff, was in October, 1982, a student in good standing in the School of Nursing at the University of North Carolina at Charlotte, a branch of the University of North Carolina.

On October 21, 1982, plaintiff took an examination in a nursing school course called "Nursing 311" under the supervision of Professor Theresa Zweber. Near the end of the examination, plaintiff spoke to Professor Zweber and requested and got a clarification of two questions on the exam. After the test was concluded, plaintiff told some other students in the class that Professor Zweber had told her the answers to two questions.

Five days later plaintiff was called in to see Nursing School Dean Louise Schlachter, who informed her that several students had accused her of cheating on the examination. Dean Schlachter gave plaintiff the choice of taking an "F" in the course or being prosecuted in the Student Court. She chose the Student Court.

On November 1, 1982, plaintiff received informal notice that her hearing would be conducted by the Student Court (composed of three students) on November 3, 1982. Formal notice of the hearing was not given until the day of the hearing.

Before that time plaintiff was never informed that she had the right initially to select a hearing before the Chancellor's Hearing Panel rather than the Student Court. Plaintiff also was not provided notice of the identity of her accusers, the nature of the evidence against her, or the specifics of the charges. Under applicable university regulations, neither plaintiff nor the prosecution was entitled to be represented by counsel *at* the hearing since the process was "non-adversarial" in nature (Plaintiff's Exhibit B, p. 10, ¶ V.F.). However, Nursing School Dean Schlachter appeared at the hearing, acted as "attorney for the prosecution" and, according to the verified complaint, intimidated the student justices (Verified Complaint, ¶ 16). Plaintiff was found guilty by the Student Court,

regardless of "whether it be intentionally or unintentionally" (Plaintiff's Exhibit S). The Student Court imposed as a sanction a grade of "F" in the course, and disciplinary probation for a semester. No record of the hearing was made.

Following the Student Court proceeding, plaintiff promptly retained counsel and filed a written "appeal" with Chancellor E.K. Fretwell, Jr. (Plaintiff's Exhibit E, November 5, 1982). Reciting new evidence, the seriousness of the case, and the serious procedural and substantive flaws in the Student Court proceeding, and the lack of a record of what had happened there, plaintiff's counsel requested that the Chancellor grant Ms. Jones a "new hearing" before the Chancellor's Hearing Panel. Such a "new" hearing was authorized in two letters from the Chancellor dated December 6, 1982 (Plaintiff's Exhibits F and G).

A three-member Chancellor's Hearing Panel met and heard evidence for seven or eight hours on December 16, 1982, and by letter of December 17, 1982, reported to Chancellor Fretwell that they had "found Ms. Jones not guilty as charged" (Plaintiff's Exhibit K).

That verdict was received by the Chancellor on December 20, 1982. The next day William M. Steimer, Assistant to the Chancellor for Legal Affairs, in his capacity as attorney for the College of Nursing, wrote a letter to the Chancellor. He made a stringent argument in favor of plaintiff's guilt and urged that the "advice" of the Hearing Panel be "considered of little use or consequence" (Plaintiff's Exhibit L).

On December 27, 1982, Chancellor Fretwell wrote a letter to counsel which began as follows:

Gentlemen:

Regarding Ms. Nancy Jones, a student at the UNCC College of Nursing, a Student Judicial hearing found that she had cheated in an examination. An appeal was then had to me under 501, c, 4 of the Code of The University of North Carolina. I referred the matter to the UNCC Hearing Panel which serves to advise me. That panel held a hearing on December 16, 1982, and gave me a letter dated December 17 which advised me of its recommendation. Counsel for the Dean of Nursing in a letter dated December 21 has commented adversely on both the recommendation and the procedure. It is now my responsibility to decide on the appeal from the Student Judicial finding.

The Chancellor indicated that Dr. James H. Werntz, Jr., Vice-Chancellor for Academic Affairs, would review the case and render a decision based upon the record generated before the Hearing Panel and upon memoranda to be submitted by counsel (Plaintiff's Exhibit M).

Dr. Werntz received a transcript of the hearing and memoranda from counsel and on January 10, 1983, wrote counsel that he had "concluded that the offense charged was committed by Ms. Jones." He reinstated the penalty originally recommended by the Student Court (Plaintiff's Exhibit N).

On January 18, 1983, Dr. Werntz advised counsel of a further penalty—that plaintiff (because of her grade of "F" in Nursing 311) was ineligible to be enrolled for the spring semester 1983 (Plaintiff's Exhibit O).

On January 19, 1983, plaintiff brought this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief. She alleges that the University's disciplinary action against her was unconstitutional, because the school failed to follow its own procedures and because the procedures actually afforded her did not themselves satisfy the minimum requirements of due process.

The case is now before the court on plaintiff's motion that she be reinstated as a student in good standing in the School of Nursing pending final resolution of her case on the merits.

## II. PRELIMINARY INJUNCTION

### A. The Standard

In this circuit the trial court standard for interlocutory relief is the "balance-of-hardship" test. *North Carolina State Ports Authority v. Dart Containerline Co.,*

592 F.2d 749 (4th Cir.1979); *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). In *Dart Containerline,* Judge Winter summarized this test as developed in *Blackwelder* and other previous cases:

> ... Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

592 F.2d at 750. The Court of Appeals emphasizes that, "where *serious* issues are before the court, it is a sound idea to maintain the *status quo ante litem,* provided that it can be done without imposing too excessive an interim burden upon the defendant ...." *Blackwelder, supra,* 550 F.2d at 194–95 (citations omitted).

## B. The Balance of Hardships

■ If plaintiff is not reinstated as a student in good standing in the School of Nursing pending resolution of her suit on the merits, she will miss the remainder of the present semester and perhaps additional semesters as well. Four consequences seem certain, even if plaintiff ultimately prevails:

1) Plaintiff will be delayed at least a semester in her quest for a degree in nursing.

2) Plaintiff will have to explain for the rest of her professional life why she took a semester (or longer) off during her studies and what she was doing during that time.

3) Plaintiff's ability to earn a living as a nurse will be deferred for however long the completion of her training is postponed.

4) Plaintiff will be permanently deprived of the opportunity to complete nursing school with the group of colleagues and friends with whom she has worked and shared the ups and downs of academic life.

Although it may be difficult to put a precise dollar value on plaintiff's damages (a question not now before the court), it is clear that plaintiff could never be adequately compensated for these injuries, whatever their degree. In addition, a quiet exoneration at some point in the future could never fully erase the highly stigmatizing effect that defendants' actions against plaintiff have had and will continue to have, if the plaintiff is right in her claim.

Defendants not only belittle these injuries to the plaintiff but raise a frightening spectre of "substantial harm" to the University. They suggest that reinstatement of plaintiff is likely to spark a wave of campus unrest and academic dishonesty as students, secure in the knowledge that the federal courts will come to their defense, violate the University Disciplinary Code with impunity. This alleged harm is entirely speculative and defendants have offered no evidence in support of their claim. The court finds that the likelihood of such harm resulting from plaintiff's being allowed to continue her studies until her serious constitutional claims are resolved is, at most, scant.

The court finds, then, that the balance of hardship is decidedly in plaintiff's favor. Any uncertainty about the precise quantum of harm she will suffer is more than compensated for by the fact that defendants have demonstrated little or no likelihood of

harm to them, and by the strong showing plaintiff has made of her probable success on the merits.

## C. Probability of Success

■ It is well settled that when a public school or state university takes disciplinary action against a student which, for any substantial length of time, deprives the student of the opportunity to continue his or her education, the school must afford the student due process of law. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). *See also Dillon v. Pulaski Cty. Special School Dist.,* 468 F.Supp. 54 (E.D.Ark. 1978), aff'd., 594 F.2d 699 (8th Cir.1979); *Escobar v. State University of New York,* 427 F.Supp. 850 (E.D.N.Y.1977). In *Goss* the Supreme Court held that even a ten-day suspension for misconduct infringes upon a student's property interest in the benefits of public education and liberty interest in reputation. 419 U.S. at 574–575, 95 S.Ct. at 736–37. The state may not interfere with these interests, said the Court, without providing the student constitutionally fair procedures. *Id.*

Due process is a flexible concept and "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The role of this court, therefore, is not to prescribe in the abstract the procedures that must be followed in all cases of student discipline, but to determine whether the procedures afforded *in this case* were constitutionally adequate.

■ On the basis of the record now before the court, it appears that the hearing plaintiff received in the Student Court was grossly lacking in due process of law. Defendants do not seriously dispute this assessment.

By contrast, the hearing before the Chancellor's Hearing Panel seems to have been eminently fair. If that Panel had found against plaintiff it is unlikely that she would have been able successfully to challenge the result.

However, the "not guilty" finding of the Panel was not permitted to stand. Acting through his delegate, Vice-Chancellor Werntz, the Chancellor swept aside the Panel's decision, treated it as "advice" only, ruled that plaintiff was guilty, and imposed a severe sanction. Plaintiff claims that this reversal by the Chancellor violated both the University's regulations and due process of law.

Plaintiff contends that the hearing ordered by Chancellor Fretwell before the Chancellor's Hearing Panel was a new, *de novo* hearing, in which she was entitled to due process and that the verdict of "not guilty" was final, just as it would have been if she had known about and chosen that forum in the first instance, and had never been prosecuted in the Student Court; that under University regulations a finding in favor of the accused in a *de novo* hearing is final; that though the accused may appeal, the prosecutor may not; and that the Chancellor has no authority to reverse an acquittal or to increase the penalty (Appendix, ¶ (4), p. 272, §§ XI, XII, XIII, XIV. Plaintiff thus contends that the Chancellor arbitrarily disregarded University rules and rendered her procedurally fair hearing before the Hearing Panel meaningless, and denied her due process of law.

Defendants contend that plaintiff was never granted a *de novo* hearing before the Chancellor's Hearing Panel; they say she was merely allowed to *appeal* her conviction in the Student Court to the Chancellor; that in accordance with University regulations regarding *appeals* (Appendix, ¶¶ (5) and (6), pp. 272–274), the Chancellor only sought the "advice" of the Hearing Panel, and that the ultimate power to decide plaintiff's appeal rested at all times in the Chancellor's hands.

Defendants' position is inconsistent with much of the record:

a) *The Chancellor's Correspondence:*

On November 9, 1982, the Chancellor wrote plaintiff's lawyer acknowledging his

"appeal" from the Student Court decision and calling his attention to the fact that the appeal was governed by Section III.A.2 of the Procedures. However, in his letter to plaintiff's counsel dated December 6, 1982 (Plaintiff's Exhibit F), Chancellor Fretwell said:

1) "that Ms. Jones' request for a *new hearing* will be granted" (emphasis added);

2) that he reached this conclusion "reluctantly and primarily on the ground that there is some disagreement whether the hearing in Student Court was handled appropriately";

3) "that Mrs. Jones could initially have had *the hearing before the Chancellor's Hearing Panel she now* seeks" (emphasis added).

The above statements show that although the Chancellor originally treated the "appeal" as addressed to his sole discretion, he had changed his mind before the hearing; that he had recognized that he was dealing with an extraordinary event—a *new hearing* on the merits—instead of a routine event—an appeal from a properly constituted court and a proper decision. The hearing granted was a hearing which Ms. Jones "could initially have had" if she had known to ask about it. Though a semantic argument to the contrary could be made, I believe the substance of the communications supports plaintiff's claim that it was a new hearing which was intended.

.   b) *The Chancellor's Procedures:*

Section III.B.1.a. of the Chancellor's Procedures (Plaintiff's Exhibit C at 5) provides in pertinent part that

    . . . Grounds for such appeal to the Chancellor from a Student Court decision are limited to one or more of the following:

      i.   an allegation that one or more of the "Rights Guaranteed the Accused" (Section V of the Student Disciplinary Governance Act) have been violated,

      ii.  an allegation that the sanction recommended is too severe for the violation; and

      iii. an allegation that new evidence has developed which has bearing on the verdict.

    c) *The fact-finding (rather than error-seeking) hearing ordered by the Chancellor and conducted by the panel— and the panel verdict:*

The record shows that the Chancellor ordered and the Committee conducted a full-scale fact-finding hearing to determine, from scratch, whether plaintiff had committed the offense charged. The panel was not instructed and did not attempt to determine whether plaintiff had demonstrated one of the three grounds for reversing or vacating a decision of the Student Court. Rather, they "found Ms. Jones *not guilty* as charged" and reported their *finding* (not their "advice") to the Chancellor.

The text of the November 5, 1982 letter from plaintiff's counsel requesting the hearing assigns errors in part in the "appeal" language of the University regulations, and a semantic argument can be made that what plaintiff sought was in fact an "appeal." I do not think there is much substance to that argument; the realities are that counsel did what a good lawyer has to do, and that is to try to follow the steps prescribed by the rules for getting his case into another court. The evidentiary nature of the hearing before the Chancellor's Hearing Panel, and the Panel's entry of a "not guilty" finding, rather than a discussion of error in the Student Court proceeding, speak louder than the phrasing of that particular part of plaintiff's lawyer's request for a new hearing.

Moreover, since the University had abandoned all reliance on the Student Court proceeding, it was necessary that the second hearing be a full, due process hearing on the merits, if any conviction and punishment were to be had.

As noted earlier, the purpose of the second proceeding as conceived and executed was not to review the proceedings and decision of the Student Court. Had the Chancellor or any of his delegates per-

formed a conventional *appellate* function, they could have ordered the Student Court's decision set aside and remanded the case for a new trial. If a procedurally fair hearing had then been held, this controversy might have been avoided. On the other hand, if the Chancellor had simply found "no error" in the Student Court proceeding and affirmed plaintiff's conviction, he would have thereby endorsed the denials of due process in that proceeding, and would have to stand or fall on their obvious defects.

But the Chancellor did not perform a conventional appellate function. Instead, he set out to find the facts afresh, and in order to do so enlisted the aid of the Chancellor's Hearing Panel. In this fact-finding process, the Panel conducted a procedurally fair hearing, but the Chancellor then exercised (according to defendants' counsel) "unfettered" discretion to reject their findings.

After going through the motions of due process, the Chancellor rejected the Panel's findings and substituted his own, *opposite* decision.

The illusion was due process but the substance was arbitrary action.

If the Hearing Panel were always advisory and the Chancellor free to do as he pleased, all of the procedural protections before the Panel would go for naught.

Moreover, even if the procedure followed with regard to the second hearing were acceptable as standard procedure if it were followed in all cases of student discipline, it was constitutionally intolerable to subject plaintiff alone to such procedures under these circumstances. Plaintiff under the Rules was entitled, like all students, to a fair initial hearing, and to the benefit without appeal, of the "not guilty" finding (Plaintiff's Exhibit B, p. 13). She has at last had a fair hearing, but not the benefit of the "not guilty" finding. The Chancellor's decision to allow the prosecution to "appeal," and his reversal of the finding make a nullity of the "due process" Panel Hearing.

Although not every departure from a university's regulations necessarily constitutes a deprivation of due process, *see, e.g., Escobar, supra,* 427 F.Supp. at 858, the difference between the process afforded plaintiff and that to which she and all other students are entitled is so great as to rise to the level of a constitutional violation.

It therefore may not be crucial in last analysis whether the second hearing was a new hearing or an "appeal"; the result of the Chancellor's final action was a final denial of the fundamental fairness which we call due process of law.

The parties have not cited and the court has not found any cases directly on this point. Each party, however, has cited a case in which a court has considered whether a departure from established university procedures for student discipline was so unfair as to violate due process. *Escobar v. State University of New York,* 427 F.Supp. 850 (E.D.N.Y.1977) is the case most nearly in point. Escobar, a New York State University student, had a hearing on charges of misconduct before a "Judicial Review Committee," in accordance with the Student *Code,* and was subjected to disciplinary action. The President of the college then took matters into his own hands. Invoking the University's *Rules* of Public Order, but without following the procedural requirements of those rules, he overrode the decision of the Committee and imposed a more severe sanction. The court held that the President could not invoke the Rules once the student had been disciplined under the Code. The holding of the court is stated in one paragraph:

"Of course, not every deviation from a university's regulations constitutes a deprivation of due process. *Winnick v. Manning,* 460 F.2d 545 (C.A.2 1972); *Edwards v. Board of Regents,* 397 F.Supp. 822 (W.D.Mo.1975). But where, as here, an offending student has been formally charged under the college's disciplinary code, has been subjected to a hearing, has been officially sentenced, and has commenced compliance with that sentence, it is a denial of due process of law for the

chief administrative officer to step in, conduct his own *in camera* review of the student's record, and impose a different punishment without complying with any of the procedures which have been formally established for the college. Here the President simply brushed aside the college's formal regulations and procedures and, without specific authority, imposed a punishment of greater severity than determined by the hearing panel, a result directly contrary to the Code's appeal provisions."

427 F.Supp. at 858.

Defendants rely on *Edwards v. Board of Regents of Northwest Missouri State University,* 397 F.Supp. 822 (W.D.Mo.1975). In that case a student was brought before the Student-Faculty Discipline Committee for a hearing on several charges of disciplinary infractions. The Committee thoroughly exonerated the student. Two weeks later, the President of the University notified the student that a second hearing would be held before the Board of Regents to consider disciplinary charges against him, including the charges of which he had already been acquitted. The Board of Regents found the student guilty as charged and voted to expel him permanently from the university.

The court found that the *de novo* hearing before the Board of Regents was "not contemplated under the regulations adopted by the University," *id.* at 827, but, as plaintiff conceded, *it complied with due process.* The court concluded that "the deviation from university regulations in this case did not result in any deprivation of plaintiff's right of due process ...." 397 F.Supp. at 830.

*Escobar* supports the conclusion that plaintiff in this case was denied due process, and *Edwards* is not inconsistent with that conclusion. In *Edwards* the results of an initial hearing were overriden not through *in camera* review by a single university administrator but after a full scale due process hearing before the Board of Regents. In addition, the university was dealing with a student who had a long and known history of disruptive, insubordinate,

threatening conduct. *See Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903 (the state interest at stake must be considered in determining whether the procedures afforded were fair). Here there was no reason for the University to deny plaintiff the sort of hearing she and all other students are entitled to under the rules and to replace it with a proceeding that was, at the very best, procedurally less fair.

In sum, plaintiff has demonstrated a very high probability of success on the merits.

## D. The Public Interest

In *Blackwelder, supra,* the Court of Appeals noted that "[o]ne reason for ... lenient interlocutory relief standards ... is the 'public interest' in preserving the *status quo ante litem* until the merits of a *serious* controversy can be fully considered by a trial court." 550 F.2d at 197. Where, as here, what is at issue is the vindication of an individual's constitutional rights, that basic public interest is enhanced. This factor weighs in favor of the requested relief.

On the basis of all the evidence of record, the arguments of the parties, and the pertinent law, the court concludes that plaintiff's motion for a preliminary injunction should be granted.

IT IS THEREFORE HEREBY ORDERED that defendants immediately reinstate plaintiff Nancy Jones as a student in good standing in the School of Nursing at the University of North Carolina at Charlotte and impose no sanctions upon plaintiff pending final resolution of this case.

## APPENDIX

THE ROLE OF THE CHANCELLOR'S HEARING PANEL IN STUDENT DISCIPLINARY PROCEEDINGS AT THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE (ABSTRACTED FROM PLAINTIFF'S EXHIBITS B AND C):

(1) The Chancellor's Hearing Panel is a body of thirteen persons appointed by the Chancellor: five faculty members, four students, and four members of the staff. One of the faculty members is designated by the

Chancellor as chairman (Plaintiff's Exhibit C, p. 2, ¶ II.B.1.). The Hearing Panel serves, among others, the following two functions:

"1. To serve, in the sole discretion of the Chancellor, as an investigatory and advisory body with respect to any appeal of the disposition of a grievance carried to the Chancellor pursuant to Section 501(C)4 of *The Code* of the University of North Carolina, including appeals from decisions of the Student Court. (See Section III.A. of this document for procedures.)

"2. To hear and decide cases in which a student is charged with violation of the "Code of Student Responsibility" (Section II of the Student Disciplinary Governance Act), and where all conditions specified in Section VI.C. of that Act are met:

a. Suspension from the University is a possible remedy;

b. the student will be represented by another person; and,

c. the accused student notifies the Student Attorney General within 48 hours after receipt of the notice of charges that he or she wishes the case referred to the Office of the Chancellor for hearing by the Chancellor's Hearing Panel. (See Section III.B. of this document for procedures.)"

(Plaintiff's Exhibit C, p. 1, ¶ II.A.).

(2) Paragraph IV.A. of the Student Disciplinary Governance Act (Plaintiff's Exhibit B) provides that

"... [A]ll matters of alleged violations of the Code of Student Responsibility shall be subject to the jurisdiction of the Student Court, except that if the notice of charge indicates that suspension from the University is a possible remedy, the accused person may refer the case to the Office of the Chancellor for hearing by .the Chancellor's Hearing Panel, provided he/she meets the requirements of Section VI.C. below."

*See also id.,* ¶ V.F.

(3) The procedures for an original hearing before the Chancellor's Hearing Panel are as follows:

"III. *Specific Procedures of the Office of the Chancellor and Chancellor's Hearing Panel in Campus Dispute Resolution.*

\*　　\*　　\*　　\*　　\*　　\*

B. *Procedures with respect to student disciplinary matters.*

\*　　\*　　\*　　\*　　\*　　\*

2. Original hearing before the Chancellor's Hearing Panel

Where a matter of student discipline constitutes the election by a student accused of a violation of the Student Disciplinary Governance Act to bypass the Student Court in order to obtain a hearing before a committee of the Chancellor's Hearing Panel, the following procedures shall apply.

a. The Office of the Dean of Students or the Student Attorney General will forward the Office of the Chancellor notice that an accused student wishes a case referred to the Office of the Chancellor for hearing by the Chancellor's Hearing Panel, confirming that *all* prerequisites to such election have been met as described in Section VI.C. of the Student Disciplinary Governance Act, and enclosing the documents relevant to the charge.

b. The Office of the Chancellor shall immediately refer the matter to the Chairman of the Chancellor's Hearing Panel, who shall appoint from panel membership one faculty member, one staff member, and one student member to constitute a Disciplinary Hearing Committee. The Disciplinary Hearing Committee shall be chaired by the faculty representative.

c. The Disciplinary Hearing Committee Chairman shall be responsible for scheduling and conducting the hearing in accordance with the 'Chancellor's Hearing Panel Procedures for Hearing on Charge of Violation of Code of Student Responsibility,' included here as Exhibit 1."

(Plaintiff's Exhibit C, pp. 4–6).

(4) "Exhibit 1," the "Chancellor's Hearing Panel Procedures for Hearing on

Charge of Violation of Code of Student Responsibility," provides in pertinent part:

"IX. At the conclusion of the presentation of evidence and arguments on the issue of guilt, the Committee shall deliberate in executive session, and thereafter vote upon the issues presented on the basis of evidence taken at the hearing. The panel shall make a finding with respect to each of the charges. If a majority finds all the charges not proven, it shall so announce and terminate the proceedings. The Chancellor shall be so notified in writing.

"X. If a majority of the Committee finds the charges proven in whole or in part, it shall so announce, and shall then permit the respondent and the official to present evidence relevant to the question of appropriate sanctions. Such evidence may take the form of testimony, written statements, recommendations, or arguments.

"XI. The Committee, after considering the material presented according to paragraph X, shall determine appropriate sanctions.

"XII. The Committee shall provide the respondent and the Chancellor with a report which includes:
A. the finding with respect to each of the charges,
B. a statement of the reasons supporting the finding; and
C. a statement of the sanctions to be imposed and the reasons therefore. [sic] The tape recording of the hearing shall accompany the report to be submitted to the Chancellor.

"XIII. The respondent shall have ten days from receipt of the report to appeal the decision and sanctions to the Chancellor. The appeal shall be written and shall set forth the basis upon which the respondent believes that the decision is erroneous or the sanctions inappropriate. If no appeal is filed within ten days of receipt of the report, the Chancellor will notify the respondent and appropriate University officials that the sanctions are to be imposed.

"XIV. If an appeal is timely filed, the Chancellor or his delegate shall review the appeal. After review, the Chancellor may:
1) confirm the decision and sanction by written notice to the respondent,
2) alter the decision or sanctions as he sees fit, except that no sanction may be more severe than that imposed by the Committee, or
3) remand the matter to the Committee with instructions for further action. Thereafter the Committee shall submit its revised findings and supplemental advice concerning sanction, after which the Chancellor may proceed as in 1) or 2)."

(Plaintiff's Exhibit C, pp. 13–14.)

(5) Appeals from decisions of the Student Court are ordinarily governed by a different web of procedures. Section X of the Student Disciplinary Governance Act (Revised August, 1982), entitled "Appeals," provides that

"Any accused student or complainant may appeal the decision of the Student Court hearing panel or the administrative hearing panel to the Office of the Chancellor, provided a written statement of intent to appeal and the ground or grounds for appeal are filed with the Dean of Students office within seventy-two (72) hours after notice of the decision. Acceptable grounds for appeal are:
(1) that an alleged violation of the rights guaranteed the accused has occurred;
(2) that the sanction is too severe for the violation; and
(3) that new evidence has developed which has bearing on the verdict.

Decisions of the Student Court hearing panel (or administrative panel) become effective as soon as the time has elapsed for filing a notice of appeal, unless the date of sanction is otherwise specified by the Court. If notice of appeal has been given, sanctions will not commence until

a final decision has been rendered by the Office of the Chancellor."
(Plaintiff's Exhibit B, p. 13.)

(6) Once a case is appealed to the Office of the Chancellor, it is handled according to the Procedures of that Office (Plaintiff's Exhibit C, cited above):

"III. *Specific Procedures of the Office of the Chancellor and Chancellor's Hearing Panel in Campus Dispute Resolution.*

\* \* \* \* \* \*

B. *Procedures with respect to student disciplinary matters.*

1. Appeals from decisions of the Student Court

a. Where a matter of student discipline constitutes an appeal from a decision of the Student Court or an Administrative Hearing Panel operating under the Student Disciplinary Governance Act, the student is required to provide the Student Attorney General with written notice of appeal, stating the grounds therefore [sic], within seventy-two hours after receiving notice of the Student Court decision. Grounds for such appeal to the Chancellor from a Student Court decision are limited to one or more of the following:

i. an allegation that one or more of the "Rights Guaranteed the Accused" (Section V of the Student Disciplinary Governance Act) have been violated,

ii. an allegation that the sanction recommended is too severe for the violation; and

iii. an allegation that new evidence has developed which has bearing on the verdict.

b. The Office of the Dean of Students or the Student Attorney General shall forward to the Office of the Chancellor all such written appeals timely filed.

c. Thereafter, the matter shall be treated as other appeals. (Section III.A., beginning with A.2.)."

\* \* \* \* \* \*

"III.A.2. Upon receipt of the appeal, the Chancellor or his delegate may

a. after consulting with the Chairman of the Chancellor's Hearing Panel, inform the appellant that the appeal should properly be directed to another University official or body,

b. decide the appeal without reference to the Chancellor's Hearing Panel,

c. request additional information from the appellant before taking any action.

d. notify the appellant and the Chairman of the Chancellor's Hearing Panel that he is referring the matter to the Chancellor's Hearing Panel for investigation and advice before reaching a decision,

e. take such other action as he deems appropriate.

3. If the Chancellor refers the appeal to the Chancellor's Hearing Panel, the Chairman of the panel shall select, from panel membership, one faculty member, one staff member, and one student who shall constitute the Appeal Committee. The Appeal Committee shall be chaired by the faculty representative.

4. The Appeal Committee may make such investigation of the appeal as it deems appropriate, including asking the appellant or others in the University for additional written or oral information, discussion, or argument which will assist in reaching conclusions on the appeal. The Appeal Committee may schedule a hearing on the appeal if it determines that such hearing will assist in reaching conclusions concerning the matters at issue. Such hearing shall provide five days' written notice to participants. The Committee may request to appear before it any person who may assist in resolution of the appeal.

5. The Appeal Committee may consult freely with the Chancellor before providing its advice.

6. The Appeal Committee Chairman shall give its advice and recommendations for a decision in the form of a report *to the Chancellor only* within twenty days after the Chancellor refers

the matter to the Chancellor's Hearing Panel. The advice shall be written and shall express the reasons for the decision recommended.

7. Upon receipt of the report, the Chancellor may refer the matter back to the Appeal Committee for further investigation or clarification.

8. After completing review of the report, the Chancellor shall announce his decision to the appellant in writing, with copies to the chairmen of the Chancellor's Hearing Panel and the Appeal Committee. Where his decision varies from the advice and recommendations of the Appeal Committee, the Chancellor shall notify the committee of the reasons for the variations."

(Plaintiff's Exhibit C, pp. 4–5.) (Footnote omitted.)