NORTH CAROLINA STATE PORTS AUTHORITY, International Longshoremen's Association, AFL–CIO, Local 1426, International Longshoremen's Association, AFL–CIO, Local 1426–A, Warehousemen, Appellees,

v.

DART CONTAINERLINE COMPANY LIMITED, Appellant.

No. 78–1278.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1979.

Decided Feb. 15, 1979.

Allan J. Berdon, New York City (Edwin Longcope, New York City, Rountree & Newton, Wilmington, N. C., Hill, Betts & Nash, New York City, on brief), for appellant.

George J. Oliver, Asst. Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N. C., on brief), for appellee.

Before WINTER, BUTZNER and RUSSELL, Circuit Judges.

WINTER, Circuit Judge:

Pending a resolution of a tariff controversy before the Federal Maritime Commission, the district court preliminarily enjoined Dart Containerline Company Limited (Dart), a common carrier by water, from putting into effect the substitute service

provisions of its Freight Tariff No. 1 FMC 28 pursuant to which it offered port-to-port carriage of unmanufactured tobacco from Wilmington, North Carolina, to designated European ports by direct sailing or by water or overland substitute service. The substitute service that Dart desires to offer is to issue a Wilmington bill of lading to shippers providing unmanufactured tobacco cargo at a Dart collection point in Wilmington, and thence to transport the tobacco cargo overland by motor carrier, at its own expense from Wilmington to Dart's facility at Norfolk, Virginia, for loading upon a Dart vessel for carriage overseas.

Because we do not think that the record supports the finding that plaintiffs, North Carolina State Ports Authority; International Longshoremen's Association, AFL–CIO, Local 1426; and International Longshoremen's Association, AFL–CIO, Local 1426–A, Warehousemen (hereafter Ports Authority) will suffer irreparable injury unless Dart is so enjoined, and because plaintiffs have not demonstrated a substantial likelihood of success in the proceedings instituted by them before the Federal Maritime Commission to invalidate the tariff, we reverse the judgment and direct that the injunction be vacated.

## I.

So that the significance of the facts will be more apparent, we precede them with a review of the applicable rules of law as they have been developed in this circuit. The parties agree that our decisions in *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4 Cir. 1977), and *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4 Cir. 1977), are controlling.

Summarized, the principles laid down in those cases are that in this circuit the trial court standard for interlocutory relief is the balance-of-hardship test. Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

With this explanation in mind, we turn to the facts.

## II.

### A. Injury to Dart

Dart never had the opportunity to put its new tariff into effect. The tariff became effective on September 19, 1977, but on October 14, 1977, Ports Authority filed a complaint against Dart with the Federal Maritime Commission requesting the Commission to declare the substitute service provisions unlawful under §§ 16 and 17 of the Shipping Act of 1916, 46 U.S.C. §§ 815 and 816, and § 8 of the Merchant Marine Act of 1920, 46 U.S.C. § 867. On the same day it filed the instant action, and an immediate temporary restraining order was granted.

If the tariff is valid, Dart will lost whatever revenues it might be able to generate thereunder until the injunction is dissolved. As the district court found, the time required for the Commission to reach a final decision may be years. Although Dart has been prohibited from implementing the tariff, it has made a substantial investment in anticipation of its operation. Its annual expenditure for the part of its Norfolk office used for promotion of tobacco ship-

ments amounts to $38,000, and it purchased 150 specially designed tobacco containers at an aggregate cost of $450,000 to equip itself to perform this service. Dart has no other present use for them, but it may be presumed that they would have some unknown resale value were Dart to elect to dispose of them. If Dart is obliged or undertakes to offer service from Wilmington, North Carolina, but is prohibited from transporting tobacco cargo overland by motor carrier at its own expense from Wilmington to Norfolk, it would cost Dart about $16,000 to $20,000 per day for each of an additional four days to have its ships call at Wilmington, and that move would disrupt Dart's present schedules and its competitive position.[1] In short, Dart, by reason of the injunction, will sustain not insubstantial injuries.

### B. Injury to Ports Authority

To show probable injury to it, Ports Authority proved the multi-million dollar investment in port facilities at Wilmington, including the facilities for container service, and the planned expenditure of $6.5 million more for container facilities. Its evidence showed that, at the present time, approximately 4,000 containers of unmanufactured tobacco pass through the port of Wilmington annually for transportation overseas by two water carriers, other than Dart, who presently serve the port. If the substitute service provision of Dart's tobacco tariff becomes effective, Ports Authority's deputy director believed that some tobacco cargo would be diverted to Norfolk; and if the entire 4,000 annual container shipments were lost by Wilmington, Ports Authority would suffer an annual loss of revenues of over $100,000. Other evidence showed that such a loss would endanger the livelihood of longshoremen working at the port.

The deficiency in Ports Authority's proof was the absence of specific evidence to show that Dart's substitute service tariff would divert any cargo from Wilmington to Norfolk and, if so, how much. The witness who testified as to the economic impact of a diversion of 4,000 container shipments annually was frank to admit that his figure of 4,000 was an assumption and not an informed estimate. Short of an actual basis on which to estimate the possible diversion, there was no proof of the ocean rates out of Wilmington and Norfolk, or negotiated inland transportation rates, or the relationship between each, from which any inference could be drawn as to the likelihood that a shipper which had heretofore used Wilmington as the point of shipment would divert its traffic to Norfolk by use of Dart's substitute service tariff. In short, while Ports Authority raised the spectre of possible irreparable harm to it, it fell far short of proving the likelihood of any actual irreparable injury.

### C. Ports Authority's Probability of Success

In its complaint before the Federal Maritime Commission, Ports Authority charges that the substitute service provisions of Dart's tariff constitute an unreasonable or undue preference for the port of Norfolk and an unjust discrimination against the port of Wilmington in violation of §§ 16 and 17 of the Shipping Act of 1916. It also invokes § 8 of the Merchant Marine Act of 1920 which, while it contains no prohibitions or directives aimed at water carriers, does express a national concern for the development and protection of the economic interests of ports. Specifically, Ports Authority contends that under such decisions as *Sea-Land Services, Inc. v. South Atlantic & Caribbean Line, Inc.*, 9 FMC 338 (1966),[2]

---

1. Of course if the validity of the new tariff is sustained, Dart will incur the expense of overland transportation from Wilmington to Norfolk. That cost is not shown, but it would offset the increased cost of direct service.

2. In *Sea-Land*, the FMC defined port equalization as the allowance or absorption by the ocean carrier of such amounts as will make the shipper's cost of overland transportation identical, or substantially so, from his inland point of origin to any one or two or more ports, so that the carrier can compete for cargo without calling at the port closest to the point of origin of the cargo. As of the date of decision, the Commission held such equalization a violation

and Intermodal Service to Portland, Oregon, 17 FMC 106 (1973), there is strong indication that Ports Authority will ultimately prevail before the Commission.

Of course we express no view on the validity of Dart's tariff, but we do not think that it can be said with any reasonable degree of certainty on the present record that Ports Authority will prevail before the Commission.[3] Since the decisions on which Ports Authority relies, the Commission has had occasion to reexamine and reevaluate its past decisions about diversions which are unlawful because they create an unreasonable preference or constitute an unjust discrimination. *See Council of North Atlantic Shipping Associations v. American Mail Lines, Ltd.,* —— FMC —— (August 8, 1978); *Board of Commissioners of the Port of New Orleans v. Seatrain International S. A.,* —— FMC —— (August 8, 1978). The significance of these decisions is that they substitute a flexible concept of what is a port's naturally tributary zone for the more rigid concept implicit in such decisions as *Sea-Land* and they enlarge the criteria on which reliance may be placed to justify a diversion of cargo from the port to which it is naturally tributary. Thus in *Council of North Atlantic Shipping Associations, supra,* the Commission approved for that case, as well as all future cases, these principles:

1. Certain cargo may be naturally tributary to a port, but any "naturally tributary zone" surrounding a port is constantly changing. In a particular case, this zone is determined by consideration of: (a) the flow of traffic through the port prior to the conduct in question, including points of cargo origin or destination; (b) relevant inland transportation rates; (c) natural or geographical transportation patterns and efficiencies, and (d) shipper needs and cargo characteristics.

2. A carrier or port may not *unreasonably* divert cargo which is naturally tributary to another port. When diversion of naturally tributary cargo occurs, the reasonableness of the practice must be determined. The reasonableness of the particular practice is determined by consideration of: (a) the quantity and quality of cargo being diverted (is there substantial injury?), (b) the cost to the carrier of providing direct service to the port; (c) any operational difficulties or other transportation factors that bear upon the carrier's ability to provide direct service (e. g., lack of cargo volume, inadequate facilities); (d) the competitive conditions existing in the trade; and (e) the fairness of the diversionary method or methods employed (e. g., absorption, solicitation). —— FMC ——, No. 73–38, slip op. at 7–8 (footnote eliminated).

The present record does not contain such evidence that we can make an informed prediction that Ports Authority will prevail in the proceedings before the FMC because it is not shown whether the unmanufactured tobacco which has heretofore passed through the port of Wilmington originates from Wilmington's naturally tributary zone under the current definition of that concept, and, if so, whether any diversion to Norfolk will be an unreasonable one based upon the factors which determine reasonableness.[4] In short, we do not think that the

of § 16 of the Shipping Act of 1916 "where it (1) diverts traffic from a port to which the area of origin is naturally tributary, to a port to which the area is not naturally tributary, and (2) is not justified, in the shipper's interest, by lack of adequate service out of the port from which traffic is so diverted." 9 FMC at 344.

**3.** The district court, although requested to do so by Dart, declined to invite FMC to intervene in the proceedings before it or to file a brief expressing its views. Our task, as well as that of the district court, in determining the probability of success of the underlying dispute, might well have lightened had this been done.

In another circuit, such a request is apparently required. *See Delaware River Port Authority v. Transamerica Trailer Transport, Inc.,* 501 F.2d 917, 923 n.14 (3 Cir. 1974). *See also Universal Leaf Tobacco Company v. Congoleum Corporation,* 554 F.2d 1283, 1285 (4 Cir. 1977).

**4.** What evidence there was on the point is not helpful to Ports Authority, although it, too, does not necessarily indicate how the FMC case should be decided. For example, there was evidence that Wilmington is not competitive with Norfolk in all respects, Wilmington does not have as many shipping lines or as

probability of Ports Authority's success in the attack on the validity of the tariff compensates for the weakness of Ports Authority's evidence about irreparable injury.[5]

As we view the balance between the harm to Dart of granting the injunction against the probability of irreparable harm to Ports Authority and the likelihood of Ports Authority's prevailing on the merits of the claimed illegality of the tariff, we are ineluctably brought to the conclusion that a preliminary injunction should not have been granted. Accordingly, the judgment of the district court is

*REVERSED.*

frequent service, and Wilmington has great difficulty with strikes.

5. Subsequent to oral argument, the Administrative Law Judge to whom Ports Authority's complaint before the FMC was referred filed his initial decision holding that Dart's substitute service tariff is lawful. He ruled that the origin of unmanufactured tobacco was not naturally tributary to any port and, in any event, that the evidence was insufficient to show substantial injury to Ports Authority. *North Carolina State Ports Authority, et al. v. Dart Containerline Company, Limited,* FMC Docket No. 77–50 (January 19, 1979). We do not treat this initial decision as determinative since the parties may obtain review by FMC, but it supports our conclusion that Ports Authority has not demonstrated a substantial likelihood of success on the merits.