Barbara S. FERRELL, Plaintiff,

v.

DURHAM TECHNICAL INSTITUTE; Phail Wynn, Jr., President, Durham Technical Institute, in his individual and official capacities; Arthur Clark, Dean of Instruction, Durham Technical Institute, in his official and individual capacities; Augusta Julian, Director, Educational Resources, Durham Technical Institute, in her official and individual capacities; George W. Newton, Chairman, Board of Trustees, Durham Technical Institute, in his official and individual capacities; E.L. Phillips; James I. Bolden; W. Kimball Griffin; Byron K. Hawkins; Sherrill R. High; E. Towson Moore; Nathaniel B. White; Eula Miller; James G. Huckabee, Jr.; and Edward S. Ramsey, Jr., members, Board of Trustees, Durham Technical Institute, in both their official and individual capacities, Defendants.

Civ. No. C-83-375-D.

United States District Court,
M.D. North Carolina,
Durham Division.

June 29, 1983.

Thomas F. Loflin, III, Loflin & Loflin, Durham, N.C., for plaintiff.

Lewis A. Cheek and Joel M. Craig, Newsom, Graham, Hedrick, Bryson, Kennon & Faison, Durham, N.C., for defendants.

## MEMORANDUM OPINION

### BULLOCK, District Judge.

This matter is before the court on the Plaintiff's motion for a preliminary injunction under Rule 65(a), Fed.R.Civ.P. In support of her motion, Plaintiff has offered her verified complaint and several affidavits. Defendants have responded with several affidavits of their own. Having read and considered all of the memoranda and affidavits filed by counsel, the court will deny Plaintiff's motion for the reasons set out below.

### Factual Background

For purposes of this motion the court makes the following findings.

The Plaintiff, Barbara S. Ferrell, is a citizen of the United States, of Negro ancestry, and resides in Durham, North Carolina. The Defendants in this case are: the Durham Technical Institute (DTI); DTI's President, Phail Wynn, Jr.; DTI's Dean of Instruction, Arthur Clark; the Director of Educational Resources at DTI, Augusta Julian; the Chairman of the Board of Trustees of DTI, George W. Newton; and the remaining members of the Board of Trustees.

Ferrell began her employment at DTI in August of 1968. Since that time, the Plaintiff has been re-employed by the administration and trustees of DTI on an annual basis through and including midnight of June 30, 1983. Ferrell has been tendered fourteen new contracts of employment for each fiscal year following her initial employment contract. Through June 30, 1983, Ferrell is employed by GTI as a Technical Services Librarian.

In 1977, Ferrell was promoted from the position of Director of Library Services to the Director of the Learning Resources Center. In her new position Ferrell was given general supervisory responsibility for the management and operation of the library, the Curriculum Center, and Printing Services. During that same period, the Defendant Wynn was first hired by DTI as an Assistant to its then President.

Wynn was appointed interim President of DTI on May 1, 1980, and President on November 11, 1980. Sometime after his initial appointment in 1980, Wynn was approached by several staff members of the Learning Resources Center, including Janice Pointer and Brenda Nunn, with respect to certain supervisory, managerial, and morale problems within the Center. In February, 1981, Nunn and Pointer again met with Wynn, this time joined by fellow staffers Gloria Horne, Fran Tomasic, and Helen Thompson, to voice further complaints regarding the supervisory practices of the Center's Director, Ferrell.

Sometime in early 1981, the evening librarian for DTI, John Michaud, registered numerous complaints with the Institute's Academic Officer concerning library management practices. Among some of the problems raised by Michaud were that the library's card catalogue system was in disarray, that it was impossible to determine the library's real inventory, and that the library lacked a collection system.

In response to the criticisms raised by library staff members, Wynn transferred supervisory authority for the library and the Curriculum Center from Ferrell to one of his assistants, Dr. Don Watson, on May 21, 1981. On June 18, 1981, a library inventory was commenced. It was apparently discovered that approximately 9% of the Center's equipment could not be located.

On July 1, 1981, Ferrell's job title was changed from Director of the Learning Resources Center to Director of Library Services. The change in title was due to the removal of Ferrell's supervisory responsibilities. In her new position, Ferrell was ordered to report directly to Watson.

In January, 1982, Evening Librarian Michaud relayed the findings of the library inventory to Wynn. Numerous critical de-

ficiencies in the library's management were discovered. Those deficiencies had resulted in a projected loss of 7,100 items with a monetary value ranging from $134,119.00 to $305,229.00.

Thereafter, in May of 1982, Wynn was given a report conducted by a committee on academic management appointed by Wynn. The report recommended the consolidation of the Learning Resources Center with the Media Services function at DTI. The two units were eventually combined to form the Educational Resources Center. Wynn selected the former Director of Media Services, Augusta Julian, a white female, to be Director of the new unit.

The final report on library management was received by Wynn on June 29, 1982. The following day, June 30, 1982, Ferrell filed her first charge of discrimination with the Equal Employment Opportunity Commission. In her charge, Ferrell claimed that the administration of DTI had engaged in racial discrimination in their selection of Julian over Ferrell to serve as Director of the Educational Resources Center.

Ferrell filed a second charge with the EEOC on November 15, 1982. In this second charge, Ferrell contended that the administration of DTI had retaliated against her for filing the first charge on June 30, 1982, by changing Ferrell's job title on July 29, 1982, from Director of Library Services to Technical Services Librarian.

Sometime toward the end of 1982, DTI's Chief Academic Officer, Arthur Clark, the immediate supervisor of Ferrell's supervisor Augusta Julian, advised Wynn that Ferrell was not satisfactorily performing her duties and that her employment with DTI should therefore be discontinued. Wynn thereafter met with the Board of Trustees and recommended that Ferrell not be rehired after her contract expired on June 30, 1983. The Board concurred in that recommendation. Wynn then directed Clark to meet with Ferrell and advise her of the Board's decision.

The parties agree that Clark met with Ferrell on March 28, 1983, and told her at that time that her contract would not be renewed after June 30, 1983. The parties also agree that Ferrell was relieved of her on-campus duties at that time for the remainder of her contractual term and that she was given a special assignment to be performed off-campus.

Ferrell contends that during the meeting of March 28, 1983, she was told to remove immediately her personal effects from the campus and also informed that she would be arrested for trespassing if she returned without authorization. Ferrell further contends that Clark caused an armed security guard to "stand by" until the Plaintiff left the campus in order to intimidate and harass the Plaintiff. In response, Clark has averred that while Ferrell was asked to remove her personal belongings, she was never told that she was prohibited from returning to the DTI campus, but was instead directed to coordinate any necessary return through her supervisor, Augusta Julian. Clark also denies that any security guard was asked to "stand by" in order to intimidate Ferrell.

On April 27, 1983, Ferrell received from the EEOC two separate "right to sue" letters which related to Plaintiff's two charges filed with the EEOC on June 30, 1982, and November 15, 1982. In the letters, the EEOC informed Ferrell that there was no reasonable cause to believe that her allegations of racial discrimination and retaliation were true and that Ferrell was free to file a private action in federal court based upon those allegations within ninety days.

The action now before the court was commenced by Ferrell in this District on May 13, 1983. In her complaint, Ferrell alleges six counts with various claims for relief arising under 42 U.S.C. §§ 1983, 1985, and 2000e et seq. Ferrell has also invoked the court's pendent jurisdiction by alleging a state law cause of action for intentional infliction of emotional distress. In short, Ferrell contends that the named Defendants conspired to discriminate against her because of her race and because Ferrell exercised her first amendment rights in openly supporting another candidate for permanent President of DTI prior to

Wynn's appointment in November of 1980. Ferrell requests that this court enjoin the Defendants and require them to retain her in her position during the pendency of this action until disposition on the merits.

Defendants respond by claiming that the decision not to renew Ferrell's contract was made solely because of the Plaintiff's failure to perform adequately through three separate employment stages: first, when Ferrell had complete supervisory responsibility over the Learning Center; second, when Ferrell was reporting to Assistant to the President Don Watson; and third, when Ferrell reported directly to Augusta Julian, Director of the Educational Resources Center. Defendants further contend that absent immediate improvement in library conditions, DTI faces the prospect of losing its accreditation for 1984–85. In support of this allegation, the Defendants offer not only the opinions of administration officials, but also the report of a library consultant, Joline Ezzell. *Attachment to Defendants' Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction* (June 3, 1983). Defendants argue that the necessary improvement can be accomplished only through the complete cooperation of all library staffers. The Defendants maintain that the retention of Ferrell will jeopardize efforts at library improvement along with the Institute's re-accreditation because of the Plaintiff's negative attitude and because of her inability to work with fellow employees in a harmonious fashion. In support of their contentions, the Defendants have submitted the affidavits of four current library employees all of whom claim that they might resign from DTI if Ferrell is reinstated because of their unwillingness to continue working with the Plaintiff. In response, Ferrell has submitted several affidavits of former DTI employees who vouch for the Plaintiff's good character and competence.

## Discussion

■ The United States Court of Appeals for the Fourth Circuit has adopted the "balance-of-hardship" test as the relevant standard to be applied by district courts in determining whether to award interlocuto-

ry relief. *North Carolina State Ports Authority v. Dart Containerline Co.,* 592 F.2d 749 (4th Cir.1979); *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). In *Dart Containerline,* Judge Winter has summarized this standard as follows:

> .... Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of an injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

592 F.2d at 750. *Also see Jones v. Board of Governors of the University of North Carolina,* 557 F.Supp. 263, 266 (W.D.N.C.), aff'd, 704 F.2d 713 (4th Cir.1983). Having reviewed the affidavits submitted by the parties and having considered the legal memoranda submitted by counsel, the court concludes that Ferrell has failed to carry her burden of demonstrating that she is more likely to prevail on the merits than are the Defendants.

■ The court must first take cognizance of the Supreme Court's admonition that irreparable injury occurs to plaintiffs in actions alleging unlawful discharge from employment only in "extraordinary cases." *Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974). In discharge cases, the temporary loss of

income, ultimately recovered by the successful plaintiff, and any attendant damage to reputation resulting from a discharge which is later adjudicated as unlawful generally fall "far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction . . . ." *Id.,* 415 U.S. at 91–92, 94 S.Ct. at 953. As the Court observed, "[A]n insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.,* 415 U.S. at 92 n. 68, 94 S.Ct. at 953 n. 68.

Ferrell claims that if the court fails to issue an injunction she will suffer irreparable harm in that she will lose her librarian position at DTI along with research opportunities and other "invaluable relationships involving her professional career in the academic community." *Plaintiff's Motion for Preliminary Injunction,* ¶ 3 (May 13, 1983). The losses Ferrell claims she will suffer are factors common to all discharge cases which the Supreme Court has specifically ruled cannot form the basis of preliminary injunctive relief. In addition, the Defendants have produced sufficient evidence to convince the court that the DTI might suffer irreparable harm should the court order the Defendants to renew Plaintiff's employment contract at the preliminary stages of this action. The Defendants have submitted a "Report on The Library, Durham Technical Institute," prepared by Joline Ezzell, an independent consultant. That report excoriates the management practices followed in DTI's library, primarily occurring during the period of Ferrell's supervisory control of that facility. The Institute's own internal review apparently has uncovered the loss of as many as 7,100 items with a possible value of $305,229.00. The court finds that this evidence supports the otherwise bare allegations of the Defendant Wynn that DTI might lose its accreditation absent immediate and significant improvement in library conditions and practices. The Defendants have made a

strong showing that efforts to improve the library might be irreparably hindered if the court orders the renewal of Ferrell's contract. Specifically, the record is replete with allegations of library employees currently employed by DTI that uniformly cite Ferrell's inability and unwillingness to cooperate with those employees. These employees state further that because of Ferrell's disposition they would find it difficult if not impossible to continue working at DTI should the Plaintiff be returned to her position. *Affidavits of Mary Frances Tomasic, Gloria D. Horne, Helen Donnell Thompson, and Brenda J. Nunn.* (June 3, 1983).

The denial of Plaintiff's motion for a preliminary injunction should not be construed as an exposition by the court of its opinion concerning the merits of this case. Employment discharge cases often turn on intangible factors such as intent, motive, and witness credibility. Matters such as these often cannot be resolved with any clarity prior to trial. Injunctive relief is extraordinary in nature and absent compelling and obvious circumstances should not be awarded unless the moving party makes its case for equitable relief with greater precision than that accomplished in this action.